Raymond D. BATTOCCHI, et al., Appellants,

v.

WASHINGTON HOSPITAL CENTER, et al., Appellees.

No. 88–1627.

District of Columbia Court of Appeals.

Argued April 24, 1990.
Decided Oct. 16, 1990.

. 

Raymond D. Battocchi, with whom Kenneth W. Curtis and William H. Casterline, were on the brief, appearing as appellant pro se and for appellant Kathleen A. Buck.

J. Joseph Barse, Washington, D.C., for appellees Washington Hospital Center and Douglas Brady, M.D.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Raymond D. Battocchi and Kathleen A. Buck appeal from a judgment in favor of Washington Hospital Center (the hospital) and Dr. Douglas Brady (an employee of the hospital at the relevant time) in a medical malpractice action arising from injuries—including permanent brain damage—to their son Adam allegedly caused by the use of obstetrical forceps during his delivery. Dr. Brady, then a third-year resident, used

the forceps to effect the delivery after the attempts of Dr. Cohn, Ms. Buck's attending physician, also using forceps, had failed. Dr. Cohn settled before trial and was not a party to the instant suit.

Appellants raise several challenges to the conduct of the trial, foremost of which is the judge's refusal to give a missing evidence instruction as a sanction for the hospital's failure to preserve a note written by an attending nurse shortly after the delivery. We conclude that a remand of the record is necessary for an express finding central to resolution of that issue. Appellants' remaining arguments provide no basis for reversing the jury's determination.

## I. *The Delivery*

Ms. Buck entered the Washington Medical Center Hospital at 11:15 a.m. on April 2, 1982, after her amniotic membranes had ruptured spontaneously earlier that morning. At about 12:00 noon, mild contractions began. From about 1:00 p.m. until 6:30 p.m., a drug was administered to stimulate contractions, and thereafter various measures were taken to combat an abnormal labor. At 1:30 a.m. on April 3, the attending physician, Dr. Cohn, diagnosed the position of the baby as left occiput posterior (face-down). In fact, the baby's position was occiput anterior (face-up). At about 3:59 a.m., after some fifteen hours of labor, Ms. Buck was brought into the delivery room in an exhausted condition. Dr. Cohn decided to attempt a vaginal delivery using obstetrical forceps. The forceps slipped off the baby's head at least twice, perhaps several times, requiring reinsertion. Ultimately Dr. Cohn's attempts were unsuccessful. Dr. Brady was called in and, using the forceps, delivered the baby at 4:50 a.m.

Adam was born with a fracture at the base of the skull, small linear fractures of the right and left parietal bones (located on the upper sides of the skull), intracranial hemorrhaging, shock from low blood volume (hypovolemic shock), and seizures. He spent the next thirteen days in the neonatal intensive care unit. He now suffers from

mild cerebral palsy and related permanent motor and perceptual dysfunctions.

The parties appear to agree that the most significant of Adam's injuries resulted from the compressional force exerted on the skull required to move his head through the opening in the pelvic bone. There is sharp disagreement, however, as to whether Dr. Cohn or Dr. Brady, or both, exerted this considerable degree of force. Dr. Brady testified that, when he entered the delivery room, the baby's head had already passed through the pelvic opening and that the delivery was accomplished easily in a single contraction. He contended that the crushing injury occured during Dr. Cohn's attempts, when the forceps slipped off and the baby's head was squeezed between the tips of the instrument. Plaintiffs maintained that, although the forceps may have slipped off during Dr. Cohn's attempts, causing some superficial injuries, Dr. Brady failed to examine the mother to ascertain the position of the baby, which did not permit safe use of forceps, and his use of the forceps to bring the baby through the pelvic opening caused the more serious injuries.

## II. *The Nurse's Missing Note*

### A. *Factual background*

Marlene Aretino, a registered nurse, was present in the delivery room during the events in question. Because she resided in New Mexico and was unavailable to testify at trial, the court admitted her videotaped deposition in evidence. Aretino testified that, shortly after the birth, although not required to do so, she wrote a nurse's note:

> [b]ecause I felt, after I left that room, that I needed to write my side of what I had observed ... Because of what went on in there with the forceps and the way they slipped off and then they were reapplied, and what I anticipated, possibly, the condition of the baby might be.... [I] wrote a lot. I tried to document times, forceps applied, condition of the mother, condition of the baby, when Doctor Brady came in. I tried to document as much as I could remember. I remember having difficulty remembering times

> because ___ yes, the clock was there and all I had to do was glance at it, but so many things were going on, "Go get another pair of forceps; check the monitor; listen to the fetal heart tone;" that I really didn't have time, at the Delivery Room, to write everything down chronologically....

> [W]hen I left the Delivery Room, I was very upset; just very upset with the way things had turned out. [Not so much upset with the doctors, but] more upset for the family, okay....

> Around the corner from the nurse's station there's a little quiet area. I wanted to make note here that when I did [the] chart, my intent was not to incriminate anyone or lay blame anywhere; I just wanted to write what I had seen, as I had seen it, as accurately as possible.

Aretino further testified that she wrote the note, about 1⅓ pages long, on a blank form entitled "Progress Notes" obtained from the nurses' station, and placed it in the medical chart. She said that it should have appeared after other progress notes she made prior to delivery (the last at 3:50 a.m.), but when she reviewed the copy of the chart produced in discovery in preparation for her deposition, the note was not there.

To ascertain what may have become of the note, plaintiffs deposed Michael Anthony Forte, Director of Washington Medical Center. Forte testified that standard procedure in the records department was to retain original charts in active status there for eighteen months after the last activity. Following that, they would be sent to a firm in Baltimore to be microfilmed. Ms. Buck's record should have been retained in original, hard copy form until October of 1983, and then sent to be microfilmed; but after investigating the matter, Forte concluded that the chart had never been sent for microfilming.

Forte acknowledged that on May 26, 1983, the medical records department had received a request for Ms. Buck's chart from Truman Haskell, then Risk Manager for the Washington Hospital Center. The

original chart was transmitted to Haskell's office, and a departmental form indicating this fact was placed in Buck's file folder in lieu of the record. Haskell was among the few hospital personnel permitted to review a chart outside the medical records department, a privilege not enjoyed even by physicians. Forte testified that, after his internal investigation to ascertain whether the chart had been misfiled, he determined that "subsequent to Mr. Haskell's request of May 26th, 1983, the original copy ... ha[d] not been returned to the [medical records] Department."[1] When asked what he thought had happened to the chart, Forte said:

We suspected that at some point after 1983 __ some point in time after May 26, 1983 when the chart was initially signed out to Mr. Haskell and subsequent to his physical move from one office building to another office building[,] the medical record may have been misplaced or that he may have given it to someone, whereabouts currently unknown.

\* \* \* \* \* \*

We had a reorganization. Truman Haskell was reassigned and I'm hoping this is accurate, to the corporate office. A Risk Management Department was established with Marilyn Owens assuming some of the responsibilities that Truman Haskell had. Subsequently, Linda Jones. Therefore, I am surmising that they would have shared information in those files.

\* \* \* \* \* \*

I think when Truman Haskell moved to the corporate office, which is on campus, a separate building, the subsequent reassignment of responsibilities, the fact that legal also moved about the same time, there was some involvement on their part, I'm sure. The fact that Marilyn Owens' files were subsequently moved even though this was after the fact, much after the fact, it probably was mis-

filed or has yet to be located somewhere between the move and where they currently are.

Forte acknowledged that Haskell's job included reviewing charts in anticipation of litigation. At trial, as part of plaintiffs' proffer on the "missing evidence" issue, the court permitted a neonatologist, Dr. Cherian, to testify out of the jury's presence that the current practice was for Risk Management to be informed whenever an infant was born with birth trauma. It was his understanding that the same rule obtained in 1982 when Adam was born, but he did not know personally whether Risk Management had been informed in this case. He noted that the standard procedure was for the attending neonatologist or nurse to note on the chart that Risk Management had been contacted, but that there was no such notation on the charts in this case.

At trial, plaintiffs sought to have the judge instruct the jury that it could infer from the defendants' failure to preserve and produce Nurse Aretino's note that it would have harmed their case. The court, analogizing to "missing witness" cases, observed that those decisions:

support[ ] my inclination that the Court of Appeals looks with disfavor on creating evidence out of no evidence, which, of course, is what the missing evidence inference does.

The court noted that, "[u]nlike the missing witness inference where a witness is floating around somewhere who is peculiarly available to a party, and the party fails to call the witness," the missing evidence situation is "a little different because its more like a failure to preserve than a failure to produce.... [T]he [missing evidence] inference really is an illogical inference because ... the failure to preserve really doesn't in any logical way give rise to an inference that what was not preserved

---

**1.** Dr. Cohn was also deposed and stated that, sometime following the birth of Adam, he decided to contact his insurance carrier because the child was "not progressing as well as I would have liked." On May 27, 1983, he requested and received the records of both Ms. Buck and

Adam Buck, and had copies of them transmitted to his insurer. These did not contain the Aretino note. Dr. Cohn's deposition states that these were the "original" charts, but Forte testified that Cohn had received only "copies of copies."

would have been unfavorable to the party who failed to preserve it." [2] Plaintiffs' counsel responded that the inference might indeed not be logical in circumstances where, at the time the records were lost, the party failing to preserve them had no knowledge of a reason (such as of the possibility of a lawsuit) to preserve them, but that if the plaintiff could prove the defendant had such knowledge and exclusive control over the records, "the law has got to give the party damaged by the loss of the record some small advantage."

The court concluded:

Well, I understand your point and I think it's a good one. Part of my problem with your approach, all along, has been that the statement of the problem assumes the answer. We don't know that you're the party that's been damaged by the loss. For all I know, the hospital records in this case, just as one example, would show Cohen [*sic*] did this, Cohen did that, Cohen did the other thing and Brady did nothing, and since Cohen is not a party to this trial, that's Mr. Barse's [the hospital's] point. He may have been damaged by the loss of these records....

Ultimately, after considering the standards developed by this court in the area of "missing evidence" and in the analogous (criminal) context of failure of the government to preserve evidence, the judge refused to instruct the jury they could infer from the failure to preserve the note that it would be unfavorable to either the hospital or Brady. Accordingly, neither Forte nor Dr. Cherian was allowed to testify before the jury on the circumstances surrounding the loss of the note or the role of Risk Management.[3]

## B. *Legal discussion*

Appellants contend that Nurse Aretino's missing note "was a crucial piece of evidence which would shed great light on whether Dr. Cohn or Dr. Brady was responsible for causing the injuries at issue." They argue that their proffer—including the deposition of Forte and Dr. Cherian's testimony—warranted the conclusion that the hospital negligently, even intentionally, allowed the note to be destroyed and that the trial court erred in refusing to let the jury hear evidence of the loss and draw inferences adverse to the hospital under an appropriate "missing evidence" instruction.

### 1. *Rebuttable presumption*

■ Appellants first assert, relying on *Welsh v. United States*, 844 F.2d 1239 (6th Cir.1988), that the jury should have been instructed that it could *presume* negligence and causation from the fact of the missing note, thus shifting the burden of disproving all aspects of liability to the defendants. In *Welsh*, the court held that "[t]wo acts by the hospital surgeons in this case create a rebuttable presumption of negligence and proximate causation against the defendant —the negligent destruction of a skull bone flap after the second [of two] operation[s], and the consequent failure at that time to undertake a pathological examination of this evidence...." *Id.* at 1239–40. Although the court characterized the presumption of negligence and causation as "rebuttable," its discussion makes clear that it concluded a *shift in the burden of persuasion* to the defendants was an appropriate sanction for negligent loss of evidence. *Id.* at 1246–49.

We find no error in the trial court's refusal to give the requested instruction. In some jurisdictions, a presumption from destruction of evidence can substitute for a lack of affirmative proof on an essential element of a party's prima facie case. *See, e.g., id.* at 1248; C. McCormick, McCormick on Evidence § 273, at 810 & n. 20 (3d ed. 1984). Decisions in this jurisdiction, how-

---

**2.** On this "failure to preserve" point, the court analogized to cases involving the government's failure to preserve witness statements under the Jencks Act, 18 U.S.C. § 3500 (1988).

**3.** While the excerpted transcript does not contain the judge's ruling on the point, it appears that the court excluded these witnesses' testimo-

ny as irrelevant once it determined that the loss of the note was not a proper basis for an inference negative to the defendants. However, the court allowed the plaintiffs to make a proffer, which included Forte's entire deposition and Cherian's testimony summarized above, to ensure a complete record for purposes of appeal.

ever, do not appear to support this view. In *Tendler v. Jaffe*, 92 U.S. App.D.C. 2, 7, 203 F.2d 14, 19, *cert. denied*, 346 U.S. 817; 74 S.Ct. 29, 98 L.Ed. 344 (1953), our Circuit Court analyzed the problem of allocation of burden of proof of the plaintiff's violation of the Emergency Price Control Act, which the counterclaiming defendant alleged to be a fact peculiarly within the knowledge of the plaintiff. The court stated in dictum:

> There is a further rule that the omission by a party to produce relevant and important evidence of which he has knowledge, and which is peculiarly within his control, raises the presumption that if produced the evidence would be unfavorable to his cause.... Such presumption *aids the case of an opposite party having the burden of proof.... This rule, however, is not one which determines who bears the burden of proof* and, therefore, is not strictly pertinent to our present inquiry.

*Id.* at 7, 203 F.2d at 19 (citations omitted; emphasis added). In *Aetna Casualty & Sur. Co. v. Smith*, 127 A.2d 556 (D.C.1956), our predecessor court pointed out that the inference is "merely another factor which may be given consideration by the trier of the facts when weighing the evidence and determining the credibility of witnesses." *Id.* at 559. This perspective is consistent with the rule prevailing in Maryland, to whose common law we look for guidance. *See Burkowske v. Church Hosp. Corp.*, 50 Md.App. 515, 521, 439 A.2d 40, 45 (1982), *quoting Maszczenski v. Meyers*, 212 Md. 346, 355, 129 A.2d 109, 114 (1957) (well settled "that this inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the other party's case"). This court has cautioned against overuse of the missing witness inference and "the dangers inherent in creating evidence from nonevidence." *Stager v. Schneider*, 494 A.2d 1307, 1313 (D.C.1985). It would, we conclude, be inconsistent with our decisions to allow an inference appropriate in limited circumstances to be converted to a burden-shifting presumption, and we find no abuse of discretion in the judge's failure to give that instruction.

### 2. *Missing evidence instruction*

Still relying on *Welsh* and the authorities it considered persuasive, appellants contend that the judge erred in refusing to instruct the jury "that, if it found that the Hospital's loss of the note was merely negligent (or grossly negligent), it ... could draw the inference that the evidence was adverse to the Hospital." Appellants appear to hold in other words, that a missing evidence instruction is mandatory once negligence is apparent, and that it is for the jury, as the trier of fact, to weigh the circumstances concerning the loss of the evidence and draw an adverse inference accordingly. The trial judge concluded, to the contrary, that our decisions leave a trial court broad discretion on whether to give or withhold an instruction that inherently risks "creating evidence from nonevidence." *Stager, supra.* We agree, and hold that in a civil case the judge may decline to submit to the jury an issue of loss of evidence—and to instruct on missing evidence—when the conduct of the party causing the loss does not rise to the level of reckless disregard for the relevance of the evidence to a potential lawsuit.

### (a) *The law of "spoliation" of evidence*

■ The doctrine of what has been termed spoliation of evidence includes two sub-categories of behavior: the deliberate destruction of evidence and the simple failure to preserve evidence. It is well settled that a party's bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction. *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134 (7th Cir.1987); *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 587 F.Supp. 180, 190 (D.D.C.), *modified*, 593 F.Supp. 388, *aff'd*, 241 U.S.App.D.C. 83, 746 F.2d 816 (1984). Adverse inferences from the de-

struction of documents have both an evidentiary and a punitive rationale.

The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document.

*Nation-wide Check Corp. v. Forest Hills Distributors*, 692 F.2d 214, 218 (1st Cir. 1982). In essence, the inference is akin to an admission by conduct of the weakness of one's own case. *See* C. McCormick, *supra*, § 273, at 808. The other rationale for the inference "has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial." *Nation-wide Check Corp., supra*, 692 F.2d at 218.

The prevailing rule is that, to justify the inference, "the circumstances of the [destruction] must manifest bad faith. Mere negligence is not enough, for it does not sustain the inference of consciousness of a weak case." C. McCormick, *supra*, § 273, at 809. Even courts eschewing a bad faith standard have acknowledged that the destruction must transcend ordinary negligence, and evince at least knowing disregard of the importance of the document to an opposing litigant's claim. *See Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 23–24 (1st Cir.1981) (inference ordinarily improper unless documents destroyed "in bad faith" or from "consciousness of a weak case"); *Nation-wide Check Corp., supra*, 692 F.2d at 219. Where proffered evidence demonstrates that documents were concealed or destroyed in bad faith—either deliberately or with reckless disregard for their relevance—a trial court may well abuse its discretion by refusing to allow factual inferences adverse to the culpable party to be suggested to the jury through an instruction or argument of counsel. *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205–06 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983).

When the loss or destruction of evidence is not intentional or reckless, by contrast, the issue is not strictly "spoliation" but rather a failure to preserve evidence. The rule that a fact-finder may draw an inference adverse to a party who fails to preserve relevant evidence within his exclusive control is well established in this jurisdiction. *Aetna Casualty & Sur. Co. v. Smith, supra*, 127 A.2d at 559; *Hartman v. Lubar*, 49 A.2d 553, 556 (D.C.1946); *Tendler v. Jaffe, supra*, 92 U.S.App.D.C. at 7, 203 F.2d at 19; *Washington Gas Light Co. v. Biancaniello*, 87 U.S.App.D.C. 164, 167, 183 F.2d 982, 985 (1950); *Fidelity & Deposit Co. v. Helvering*, 72 App.D.C. 120, 126, 112 F.2d 205, 211 (1940). Like the spoliation rule, it derives from the common sense notion that if the evidence was favorable to the non-producing party's case, it would have taken pains to preserve and come forward with it. *International Union (UAW) v. NLRB*, 148 U.S.App.D.C. 305, 311–12, 314, 459 F.2d 1329, 1335–36, 1338 (1972); *Washington Gas Light Co. v. Biancaniello, supra*, 87 U.S.App.D.C. at 167, 183 F.2d at 985.

As the trial judge recognized, in recent years this court has dealt with the issue of failure to preserve evidence almost entirely in the criminal context of evidence the government is required to produce under the Jencks Act, 18 U.S.C. § 3500, or Super. Ct.Crim.R. 16. The court has made clear that, "[a]bsent an abuse of discretion, the decision of what sanctions, *if any*, to impose [for loss of evidence] is committed to the trial court," *Cotton v. United States*, 388 A.2d 865, 869 (D.C.1978) (emphasis in original), and that at least where the failure to preserve evidence is merely negligent, "nothing in the decisions of this jurisdiction requires that sanctions be automatically imposed." *Id.* at 870. *See also Gibson v. United States*, 536 A.2d 78, 84 (D.C. 1987); *Bartley v. United States*, 530 A.2d 692, 697 (D.C.1987); *Wiggins v. United States*, 521 A.2d 1146, 1148 (D.C.1987). It is also chiefly in the criminal cases that the court has expressed skepticism about the missing witness/evidence doctrine and underscored the discretion which the trial

judge retains to deny the instruction even when its prerequisites have been met. *See Thomas v. United States*, 447 A.2d 52, 58 (D.C.1982); *see also Stager v. Schneider, supra*, 494 A.2d at 1313 (applying same rule to civil cases, and stating that "it seldom will constitute error to deny the missing witness instruction or to prohibit argument of the missing witness inference").[4]

These principles, in our judgment, compel rejection of a rule that a party's failure in a civil case to preserve evidence regardless of degree of fault requires the court to instruct the jury on the missing evidence inference. Rather, as in criminal cases, the trial judge has discretion to withhold the issue from the jury after considering factors such as the degree of negligence or bad faith involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point. *Cf. Cotton v. United States, supra*, 388 A.2d at 869. We hold that, upon a finding of gross indifference to or reckless disregard for the relevance of the evidence to a possible claim, the trial court must submit the issue of lost evidence to the trier of fact with corresponding instructions allowing an adverse inference. Short of that finding, however, a refusal to instruct on missing evidence is not error unless we can say that the trial court, in all of the circumstances, abused its discretion.

### (b) *Application to this case*

Appellants maintain that their proffer of evidence established that the hospital intentionally, or at least recklessly, allowed the Aretino note to be destroyed. They point to the facts that (1) the Risk Management division likely had been informed of Adam's injury near the time of his birth; (2) the hospital anticipated litigation as of May 26, 1983, because the records were transmitted to Risk Management on that date; (3) the last person known to have custody of the original records was Mr. Haskell of Risk Management; (4) Haskell never returned the original records to the medical records department; and (5) after May 26, the hospital was only able to produce copies of the records which did not include the Aretino note.

■ Were this the sort of issue this court decides *de novo*, we might well agree with appellants that the evidence demonstrated at least reckless disregard by the hospital for the likely relevance of the note to a malpractice claim. But we do not decide the issue afresh. In the analogous criminal context, we have made clear that a finding by the trial court as to the degree of fault of a party in failing to produce or preserve evidence will not be disturbed unless clearly erroneous. *E.g., United States v. Jackson*, 450 A.2d 419, 426 (D.C.1982); *Johnson v. United States*, 336 A.2d 545, 547 (D.C.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976), citing *Campbell v. United States*, 373 U.S. 487, 493–95, 83 S.Ct. 1356, 136–62, 10 L.Ed.2d 501 (1963). *Cf. Simpson v. Chesapeake & Potomac Tel. Co.*, 522 A.2d 880, 885 (D.C. 1987) (trial court's implied finding of bad faith for purpose of Rule 11 sanctions reviewed for clear error). The fact that the file containing the nurse's note was called for and last in the possession of a hospital official responsible for reviewing documents in anticipation of litigation supports, but certainly does not compel, a conclusion of recklessness on the hospital's part. Forte's explanation in his deposition points to an inadvertent loss of the records during a reorganization and physical move of the Risk Management division, testimony the trial judge was free to credit. Moreover, the record indicates that, contrary to appellants' suggestion that only the Aretino note was missing from the copies of the medical records produced in discovery, Adam's footprint record and several unspecified laboratory reports also could not be located. The record, in short, does not yield a conclusion as a matter of law that the defendants acted recklessly (or worse)

---

**4.** We reject appellants' efforts to distinguish missing witness cases from missing evidence cases in a way that would favor the instruction in the latter type of case where it would be inappropriate in the former.

in permitting the loss or destruction of the note.

■ The problem is that we lack an express finding by the trial judge on either side of the issue: recklessness or mere negligence. The judge recited from the bench the principles generally governing the decision whether to impose sanctions for destruction or loss of evidence, including the gradations of culpability affecting the decision. In ultimately declining the request for an instruction, however, he merely stated that he had "considered the issue many times and read the deposition of Mr. Forte and the relevant portions of Dr. Cohn's deposition." Although we have often sustained rulings of the trial court on the basis of implied findings, we conclude that an express finding on the issue of fault is necessary in this case. First, as discussed above, the issue of the degree of fault is a close one. *See Spellman v. American Security Bank,* 579 A.2d 151, 156 (D.C.1990) ("the closeness of the fee [sanction] issue here dictates that we have the benefit of the judge's express findings in light of the applicable standard"). Moreover, as the trial judge himself recognized, the "applicable standard" governing loss of evidence in a civil case has not been set forth explicitly in our decisions until now, and thus we cannot be certain that the judge recognized that he was required to give a missing evidence instruction in the event he found that the hospital's loss of the record resulted from "gross indifference to or reckless disregard for the relevance of the evidence to a possible claim...." *Supra,* at 767. Without implying any view on the issue, therefore, we think it prudent to remand the record to the judge for an express finding on the degree of fault underlying the hospital's loss of the note, and for a corresponding application of law. Our further analysis of the matter will await that determination.

### III. *Hospital Counsel's "Missing Witness" Argument*

Appellants next contend that the defendant's counsel's commentary during closing argument about the significance of the plaintiffs' failure to call Adam and a variety of care providers who had rendered medical and therapeutic services to him as witnesses irreparably prejudiced them, and that a curative instruction issued the following day was insufficient to purge the taint. We hold that counsel's argument was improper, but that appellants waived any objection to the adequacy of the curative instruction.

■ The trial judge refused the defendants' request to issue standardized "failure to produce stronger evidence"[5] or "missing witness"[6] instructions, and expressly forbade defense counsel from arguing that "the reason these people were not called was because if they had been called[, defense counsel] would have been able to question them and [ ] would have been able to show you that their testimony would not have supported the plaintiffs' case." Acceding to this ruling, the hospital's counsel told the court:

> I don't plan to argue that, of course. That's all speculative and I think that would be inappropriate.

Nevertheless, in argument counsel suggested to the jury in essence the very inference the judge had forbidden: that the testimony of the absent witnesses would be unfavorable to the plaintiffs.

> And you'll see Dr. Michael Dennis, a neurosurgeon, was paid but you haven't heard from Michael Dennis. You'll see that Dr. David McCullough, a neurosurgeon was paid, but you haven't heard from Dr. McCullough. Dr. Miriam Davis is a neurologist ... [T]here are three, six, nine, thirteen or fourteen visits that were made to Dr. Davis ... but you haven't heard from Dr. Miriam Davis. *Have you wondered why? You should.*

> \* \* \* \* \* \*

> When you get to the jury room and wonder why, *ask yourselves why we haven't heard from these people.* Where are

---

5. Standardized Civil Jury Instructions for the District of Columbia, No. 2–3 (1981).

6. Standardized Civil Jury Instructions for the District of Columbia, No. 3–6.

they? Why can't someone tell us what this nice young boy's condition really is? Why do we have to rely upon innuendo and inference and speculation? Why ... are we asked to rely by the plaintiffs ... upon the testimony of people who have never seen Adam? [Emphasis added.]

The unspoken answer to all of counsel's rhetorical questions was that the plaintiffs did not call the absent witnesses because they would not have testified favorably about Adam's injuries. In inviting the jury to supply the answer, counsel went beyond merely "not[ing]" the absence of the witness," *Arnold v. United States*, 511 A.2d 399, 416 (D.C.1986), and made in effect a "complete" missing witness argument, *id.* at 415–16, contrary to the trial court's prior ruling.

 Immediately following the defendants' argument, plaintiffs' counsel requested a curative instruction. The court stated its willingness to instruct the jury that they could draw no inferences from any party's failure to call a witness equally available to either side. Plaintiffs' counsel responded, "That is fine," and agreed that the instruction could be given as part of the general instructions the next day in view of the late hour. The following day the judge instructed the jury:

> Either side in this case could have called any witness who had relevant and admissible testimony. For their own reasons the parties chose to call some witnesses and not to call others. You may not draw any inference for or against the plaintiffs, or for or against the defendants based on the failure of any witness to testify for one side or the other, or speculate about what their testimony would have been if they had been called.

Appellants made no objection to the instruction and sought no broader relief.

We conclude that appellants have waived any objection to the adequacy of the instruction to cure prejudice. Counsel limited his request for remedial measures to an instruction, and expressly approved the instruction the court proposed to give. He likewise acquiesced in the court's decision to postpone all instructions to the following day. In these circumstances, appellants will not be heard to argue that the instruction demanded stronger language or that a mistrial was the only adequate remedy.[7]

## IV. *Shift of Burden of Proving Causation*

Appellants contend, finally, that the trial court erred in refusing to apply an exception to the general rule that the plaintiff bears the burden of proving causation, and hence to instruct the jury that the burden was on the defendants to show that they did not cause the harm. We think the trial judge correctly recognized the inaptness of that exception to the circumstances of this case.

In *Bowman v. Redding & Co.*, 145 U.S. App.D.C. 294, 449 F.2d 956 (1971), the Circuit Court adopted a rule shifting to multiple defendants the burden of *disproving* that each was the proximate cause of the plaintiff's injury when the plaintiff has established, by a preponderance of the evidence: (1) that both defendants were wrongdoers, and (2) that one or the other, but not both, was the cause of the injury, and when further the jury is unable to find, by a preponderance of the evidence, which defendant caused the injury. In these circumstances,

> the burden will shift to each defendant to absolve itself of liability, either for the purpose of avoiding a verdict for the plaintiff or for avoiding a claim of contribution by the other defendant. If neither defendant can prove it did not cause the death, they would both be liable.

145 U.S.App.D.C. at 306, 449 F.2d at 968. *See also Canterbury v. Spence*, 150 U.S. App.D.C. 263, 287, 464 F.2d 772, 796, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

This rule is derived from an exception set forth in the RESTATEMENT (SECOND) OF TORTS, § 433B (3) (1965):

---

**7.** Even if appellants had preserved the point, we would hold the instruction given sufficient to cure the error. *Weeda v. District of Columbia,* 521 A.2d 1156, 1163–64 (D.C.1987); *Brock v. United States,* 404 A.2d 955, 959 (D.C.1979).

Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

The reason for this exception to the general allocation of burden of proof is "the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it impossible to prove which of them has caused the harm." *Id.* comment *f.*

The Restatement rule is in turn drawn from the California Supreme Court decision of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948) (en banc), where one member of a hunting party injured by a single shotgun pellet in the eye sued two others who had negligently fired their shotguns simultaneously in his direction. The plaintiff recovered against both defendants, although the injury could only have been caused by one. The court observed:

When we consider the relative positions of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof ... be shifted to defendants becomes manifest. They are both ... negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can.... Ordinarily, defendants are in a far better position to offer evidence to determine which one caused the injury.

*Id.* at 86, 100 P.2d at 4.

This court has not expressly adopted the *Bowman*/Restatement rule in the context of multiple tortfeasors, but has applied the principle to impose joint liability on two insurers when neither was able to prove that its policy was not in effect at the time of the loss, expressly relying on *Bowman*, *Summers*, and Restatement § 433B. *TransAmerica Ins. Co. v. Diplomat Parking Corp.*, 282 A.2d 564, 566 (D.C.1971).

Appellants requested a burden-shifting instruction at trial. After considering the fact that Dr. Cohn was not a party before the court and the effect this would have if the burden were shifted to Dr. Brady, the court denied the request for the instruction and instead charged the jury that if it found Brady negligent and that his negligence proximately caused the injury, it must find for the plaintiffs even if it concluded that some other person not joined as a defendant (Dr. Cohn) participated in causing the injury, and that the negligence of that person was greater.

Appellants assert that the "facts of this case warrant shifting the burden of proof of causation to [the] defendants," and that Cohn's absence from the trial strengthens, rather than weakens, the reason for applying a burden shift. Because Cohn had settled, they reason, it would have been far easier for Brady to prove that he was the sole cause of the injury. Appellees counter that appellants point to no "facts" of record at all (relying merely on theories expressed in closing argument) indicating that both Cohn and Brady were negligent but that only one caused the entire injury. They argue that, in any event, no burden shift was proper because only one party alleged to be negligent was before the court.

■ It is elementary that an instruction should be given only when there is sufficient evidence to support it. *Ceco Corp. v. Coleman*, 441 A.2d 940, 949 (D.C.1982). The *Bowman* shift is an equitable tool used to resolve a dilemma on the jury's part that could lead to nonrecovery by an obviously deserving plaintiff: the impossibility of determining which of multiple defendants caused the injury when it is clear that *all* were negligent, but only *one* could possibly be the proximate cause. Conversely, if there is no reasonable possibility that the jury will face that dilemma on the evidence presented, the instruction is not needed and ordinary instructions on concurrent proximate causation suffice, because the plaintiff can readily meet his burden by showing that the negligence of both actors substantially contributed to the injury.

On the facts of this case, we conclude appellants could not prove with the requisite degree of factual certainty that, assuming both doctors were negligent, the negligence of only one or the other caused the injury, but not both. The much more probable inference is that, if both doctors were negligent, the negligence of both concurred to proximately cause the injury.

Even if Dr. Brady was the physician who pulled the baby through the pelvis without first checking its position, it is undisputed that Dr. Cohn misdiagnosed the baby's position in the first place, and that the forceps slipped off the baby's head at least twice while he was using them. Assuming both doctors acted negligently, the evidence simply does not support the conclusion that Dr. Cohn and Dr. Brady could not both have contributed to the injury. Accordingly, the judge instructed the jury properly that if the negligence of both concurred to produce the injury, it must return a verdict for the plaintiffs. The circumstances of this case were not those that give rise to the extraordinary measure of shifting the burden of proof on causation.

Dr. Cohn's absence from the case also counsels against application of the exception. The Restatement acknowledges that generally, application of the shift has been limited to situations where "all of the actors involved have been joined as defendants." RESTATEMENT (SECOND) OF TORTS, *supra*, § 433B, comment *h*. The general rule reflects the rationale of the burden-shift, which recognizes the superior position of defendants in relation to the plaintiff to prove causation, and assumes that, absent a shift, "both defendants will be silent, and plaintiff will not recover; with alternative liability, however, defendants will be forced to speak, and reveal the culpable party, or else be held jointly and severally liable themselves." *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 505, 541 N.Y.S.2d 941, 946, 539 N.E.2d 1069, 1074, *cert. denied*, —— U.S. ——, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989). Cohn's absence, however, substantially undermines the premise of the shift: that the truth as to causation will emerge from the crucible of self-interest. Cohn had no incentive, indeed no opportunity, to develop a record showing that he did not cause the injury because, as a non-party, he did not face the prospect of joint and several liability for the jury verdict as the price of his silence. Perhaps more importantly, Brady, just as much as the plaintiffs, was denied the opportunity to test Dr. Cohn's case. We do not know whether, in attempting to exculpate himself, Cohn would have instead persuaded the jury that he alone was negligent or the sole cause of the injury. In these circumstances, no "conspiracy of silence" among defendants worked to the unfair prejudice of the plaintiffs.

### V.

The record is remanded for findings in accordance with part II of this opinion.

*So ordered.*