Arthur P. WILLIAMS, et al., Appellants,

v.

The WASHINGTON HOSPITAL CENTER, Appellee.

No. 89–849.

District of Columbia Court of Appeals.

Argued March 5, 1991.
Decided Dec. 20, 1991.

Marc Fiedler, with whom Patrick M. Regan and Mark J. Brice, Washington, D.C., were on the brief, for appellants.

Angus R. Everton, Baltimore, Md., with whom Brian J. Nash, Washington, D.C., was on the brief, for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and MACK, Senior Judge.

MACK, Senior Judge:

Appellants Arthur P. and Gloria E. Williams brought this action against the Washington Hospital Center (WHC) alleging medical malpractice growing out of WHC's failure to diagnose and treat Mr. Williams' medical condition. After a jury trial, the verdict was entered for WHC and the trial court denied appellants' motion for a new trial. In this court, appellants argue that concealment by appellee until the last day of trial that evidence critical to their case was lost, and the trial court's refusal to give a negative inference instruction regarding that loss, caused such substantial prejudice as to deny them a fair trial. We agree with appellants that, under the particular circumstances of this case, they were denied a fair trial. We remand for a new trial.

I

The "particular circumstances" to which we allude are graphically illustrated by a familiar quotation:

A little neglect may breed great mischief ... for want of a nail the shoe was lost; for want of a shoe the horse was lost; and for want of a horse the rider was lost.[1]

The circumstances began in January 1987, when appellant Arthur Williams, a cement mason, was struck in the eye while "chipping cement." [2] A few days later he began to experience pain along with flashes and black dots in his peripheral vision. He went to the eye clinic at the Washington Hospital Center where he was examined by Dr. Cheryl Mitchell, a second-year resident.[3] Dr. Mitchell performed a series of tests and examinations on appellant's eye but was unable to locate any foreign object. She discharged him with the warning to come back if the pain or other symptoms persisted. The pain and spots disappeared and for several months appellant suffered no problem with his eye.

Some five months later, while driving his car, appellant was involved in an automobile accident and suddenly realized that he could not see out of the previously injured eye. An ophthamologist discovered a cataract and a partially detached retina. An x-ray revealed the presence of a foreign body in the eye. A retinal specialist performed surgery to remove the cataract and repair the detached retina, at the same time extracting a small, sharp, metallic foreign body from the eye. After the surgery, the eye worsened, requiring two additional operations. Today, Mr. Williams is considered visually impaired and is no longer able to work as a cement mason.

Appellants filed suit against the Washington Hospital Center, contending that the failure of the examining doctor to discover the object when Mr. Williams was first injured proximately caused his visual impairment. Specifically, they claimed that Dr. Mitchell failed to perform a schleral depression examination which would have shown the presence of the foreign object. Mr. Williams testified that he did not remember the doctor performing a procedure consistent with that of a schleral depression examination and that there was no notation of such an examination in his medical record.

Appellee contended at trial that the foreign body removed from appellant's eye was not present when appellant was examined. It argued that the object entered the eye at some point after the original injury. Employing a "footprint defense," appellee presented evidence designed to show that the presence of a foreign object would have left a tell-tale track or "footprint" in the eye, such as bleeding or inflamation, readily visible during the examination. Thus, the "absence of a footprint" (no indication of blood or discoloration) could lead to the inference that no foreign body was present in the eye when Dr. Mitchell examined appellant.

Appellee also argued that, even if the foreign object had been in Mr. Williams' eye at the time of the initial examination, its location in the eye was such that a scleral depression examination would not have revealed its presence. Although Dr. Mitchell could not remember doing so, she testified that it was her usual practice to perform a scleral depression and she did not, as general rule, note such information in the medical record.

On the last day of trial, appellants' expert witness, called out of order for convenience purposes, was ready to testify. For the first time appellee's counsel revealed that the foreign object—the subject of the footprint defense—was missing. Proffers were made that after surgery, the foreign

---

1. FRANKLIN, POOR RICHARD'S ALMANAC, PREFACE: COURTEOUS READER (1758).

2. "Chipping cement" is a term of art used to describe the process of smoothing and correcting imperfections in concrete by use of hammer and chisel. In the process of chipping, particles of nails and steel, as well as concrete are dislodged.

3. Appellant claims that after conducting her examination, Dr. Mitchell called in another doctor who also examined his eye. Dr. Mitchell did not remember if she did so, nor does the consulting physician, who was on duty, remember making an examination of Mr. Williams' eye. There is no notation on the medical record that anyone other than Dr. Mitchell examined appellant on that day.

object that was removed was taped to appellant's medical record. It became part of the discovery material that was requested by appellants, used by them during the deposition process, and thereafter left in the custody of WHC to be available to both parties at trial. During the time between discovery and trial, one of the WHC doctors removed the object from the record, taped it to a 3 × 5 card, and took it to one of the hospital labs for testing. This action was taken after counsel had expressly instructed appellee that no such testing should be done, particularly without informing appellants. While in the lab, the 3 × 5 card and the object were lost. Appellee's counsel discovered the loss at the beginning of trial but did not inform appellants or the court.

Claiming that the missing object was a vital part of their argument, appellants' counsel moved for a default judgment which was denied by the court. Counsel then requested an adverse inference instruction. Finding no gross negligence or bad faith on the part of appellee, the court refused. It stated that appellants did not suffer any specific prejudice and the loss of the object was conceivably more damaging to appellee. The court agreed only to instruct the jury that a piece of evidence, intended for use by both sides, had been in appellee's care and was lost.[4]

## II

Appellants contend that the trial court erred by refusing to give a negative inference instruction to mitigate the prejudice they suffered due to appellee's loss of crucial evidence. They argue that WHC's failure to preserve evidence within its exclusive control demonstrated "bad faith" thus requiring such a sanction.

■ Appellants rely on this court's recent decision in *Battocchi v. Washington Hosp. Center*, 581 A.2d 759 (D.C.1990), which established the controlling law regarding the loss of evidence in a civil case. In *Battocchi*, we announced a standard by which a trial court could determine whether an adverse inference instruction is an appropriate remedy. Analyzing the doctrine of spoliation, we distinguished the situation where destruction of the evidence is not intentional or deliberate but rather a "failure to preserve evidence." *Id.* at 765–67. Acknowledging, however, that this jurisdiction accepts the rule that a fact-finder may be permitted to draw an adverse inference from the failure of a party to preserve evidence within his exclusive control, we held that in certain situations the trial court is required to give the instruction. *Id.* at 766–67. "[U]pon a finding of gross indifference to or reckless disregard for the relevance of the evidence to a possible claim, the trial court must submit the issue of lost evidence to the trier of fact with corresponding instructions allowing an adverse inference." *Id.* at 767. Where the negligence is not intentional or reckless, the court is accorded discretion in determining whether to give an adverse inference instruction and we will not disturb its decision absent an abuse of that discretion. *Id.*

■ In *Battocchi*, because the trial court did not make express findings on the issue of negligence, this court was unable to apply the standard.[5] In the instant case, however, the trial court made specific find-

4. In its instructions to the jury the trial court stated:

Now at various times you may have been wondering where the object is that was removed from Mr. Williams' eye.... At one point that object was preserved as part of the hospital's medical record for this patient. At some point, along the way between then and now, however, the hospital removed the foreign body from the record to do an analysis of it and thereafter it was apparently never returned to the original record. Therefore, no witness for the plaintiff or for the defendant at this trial was able to look at the actual object and testify about its size or shape or other characteristics. It is at this point simply unavailable to both sides, and the parties and witnesses have had to base their testimony on descriptions of the object contained in the medical records.

5. In *Battocchi*, the loss was that of a nurse's notes, made at the time of an injury, where a baby suffered permanent brain damage as the result of a doctor's negligent delivery. We remanded the case to the trial court for an express finding on the degree of fault regarding the loss of the notes and application of law.

ings regarding the degree of fault underlying appellee's loss of the evidence. In its order denying appellants' motion for a new trial, the court stated that appellee's loss of the object "was not the result of willful or bad faith loss or destruction, and it was not intended to gain a tactical advantage" over appellants. The court found that the central issue at trial was performance of the scleral examination and that evidence concerning the object was merely a "side issue." Moreover, the court concluded that appellants could have used stipulated evidence of the size and shape of the object and declined to do so. The court concluded that "for many of the same reasons, an 'adverse inference' instruction in the context of this case would have been both illogical and unfairly prejudicial to the defendant."

A review of the instant record compels the opposite conclusion. Appellee's behavior constitutes precisely the type of willful and reckless disregard towards the preservation of relevant evidence within its exclusive control that the instruction is designed to remedy. *Id.* at 766; *see also Alexander v. National Farmers Org.*, 687 F.2d 1173, 1205–06 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); *Washington Gas Light Co. v. Biancaniello*, 87 U.S.App.D.C. 164, 167, 183 F.2d 982, 985 (1950). The object was lost after litigation had commenced, after it was used during the deposition process, and after the parties agreed that appellees would maintain custody of it for use during trial. When Dr. Glew, the chairman of Opthamology at WHC, informed defense counsel that he wanted to test the object to discover its metal content, he was expressly told not to do so. Counsel specifically informed Dr. Glew that such testing was "destructive testing" that could not be done without informing and obtaining agreement from the Williams. Nevertheless, Dr. Glew removed the object from the medical record and took it to one of the hospital radiology labs to have it tested. Further, the test conducted—testing the degree of opaqueness of the object to x-ray—was never intended to be an issue in the case, as appellee's counsel admitted to

the court. This testing, performed despite counsel's express admonition, despite the questionable relevance of the test results, and despite the importance of the object to the Williams' case, demonstrates appellee's willful and reckless disregard for its duty to preserve the evidence. Thus, if we apply the standard from *Battocchi*, the trial court was required to issue an adverse inference instruction.

■ Moreover, under *Battocchi*, even if the trial court does not find "gross indifference or reckless disregard," it may at its discretion impose an adverse inference instruction after consideration of three factors: [1] "the degree of negligence or bad faith involved, [2] the importance of the evidence lost to the issues at hand, and [3] the availability of other proof enabling the party deprived of the evidence to make the same point." *Battocchi, supra*, 581 A.2d at 767. We review only for abuse of discretion and reverse only where the court's findings of fact and conclusions of law are clearly erroneous. *Id.; see also United States v. Jackson*, 450 A.2d 419, 425–26 (D.C.1982); *Johnson v. United States*, 336 A.2d 545, 547 (D.C.1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976).

Although this case was decided prior to our decision in *Battocchi*, the trial court, with commendable foresight, addressed all three factors. Regarding the degree of negligence, the court found that appellee acted negligently in testing the object without informing appellants and in not informing them when it was lost.

Regarding the importance of the evidence, however, the court found that the central issue in the case was the performance of a schleral examination and that the metal object itself was merely a "side issue" of little relevance to either party's argument. We cannot so conclude. The relevance of the object and its importance to appellants' case is abundantly clear from the record, which is replete with references by both parties to the object in question. As appellee's counsel told the jury during closing argument, the metal object was the "key" to the Williams' case. Indeed, appel-

lee's principal defense was that the object was not present in Mr. Williams' eye at the time of Dr. Mitchell's examination. As proof of this, counsel developed a "footprint defense," arguing that if a metal object had entered appellant's eye on January 29th, it would have left a bloody "footprint" or mark in the eye that would have been apparent to the examining doctor. It followed therefore that the fact that no such mark was visible created the inference that the object was not present at that time. Appellee introduced this theory in opening argument, stating that "upon examination, the white of the eye was normal, with no evidence of a hole ... no evidence of penetration ... no evidence of bleeding," and proceeded to develop it on cross-examination of appellants' witnesses, on direct examination of its own witnesses, and in closing argument.

Appellants represented that, in rebuttal, they had planned to counter this defense through the testimony of their expert witness, Dr. Elman. According to appellants, objects of a particular shape can penetrate the eye without leaving any tell-tale trace. After an examination of the object, Dr. Elman expected to be able to testify that because of its shape—long and narrow—it would have entered the eye without leaving a mark. As Dr. Elman stated to the court:

> It is my opinion, within a reasonable degree of medical certainty, that the shape of the object would be extremely relevant to the "footprint" issue. Specifically, it is my further opinion, also within a reasonable degree of medical certainty, that if the object was long and narrow it is unlikely to have transected a blood vessel, and have left a visible footprint.

The impact of the expert's opinion, in light of the average layman's inexperience, was lessened by the absence of the object.

Finally, the trial court considered whether the lost evidence was the only proof available to make the same point. The court found that the availability of an outline of the size and shape of the object, as well as a stipulation as to its size, was sufficient to pursue the same avenue of inquiry. Appellants point out, however,

that it is the three-dimensional shape of the object, as well as its size, that is determinative of the mark, making use of the object itself critical to their rebuttal.

Applying the lessons of *Battocchi*, it is clear from the record that the lost evidence was crucial to appellants' attempt to counter appellee's footprint defense. Accordingly, we hold that the trial court's findings of fact were clearly erroneous and its failure to issue an adverse inference instruction was an abuse of discretion.

### III

■■■ Appellants contend also that appellee's knowing concealment of the loss of the object violated certain rules of discovery and caused such substantial prejudice as to deny them a fair trial. The discovery rules impose a duty of supplementation upon the parties. A party is required to "seasonably amend" a response to papers filed in discovery, if the response, though correct when made, is no longer true and circumstances are such that a failure to amend the response is a knowing concealment. Super.Ct.Civ.R. 26(f)(2). A "knowing concealment" occurs when a party, having both actual knowledge of new information and actual knowledge that the new information is inconsistent with the prior response, does not amend the original response. *See Petroleum Ins. Agency v. Hartford Accident & Indemn. Co.,* 106 F.R.D. 59, 67–8 (1985); 8 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2049 at 323 (1970).

■■ In this case, appellee's counsel was aware that the object was part of requested discovery material to be available to both parties at trial. Knowing that appellants had used the object during the deposition process, counsel should reasonably have expected them to use it at trial. Counsel was also fully aware during trial that the object was lost, "I became aware of the fact that this thing was missing at the beginning of trial...." Yet, counsel concealed that fact from appellants and the trial court, revealing the loss only after appellants' counsel requested the object on the last day of trial.

■ The purpose of the duty to supplement is to prevent unfair surprise and to narrow and define the issues prior to trial so that the progress of the trial may be efficient and orderly. *See Regional Redevelopment Corp. v. Hoke*, 547 A.2d 1006, 1008 (D.C.1988); *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1262 (D.C.1979). The court may, in its discretion, impose sanctions when this rule is violated, including exclusion of the evidence, continuance, default judgment, dismissal or other action as the court deems appropriate. *See Weiner v. Kneller*, 557 A.2d 1306, 1309 (D.C.1989); *Bell v. Jones*, 523 A.2d 982, 990 n. 11 (D.C.1986); *Corley, supra*, 402 A.2d at 1261; *Hollins v. Snead*, 300 A.2d 447, 449 n. 4 (D.C.1973); 8 WRIGHT & MILLER, *supra*, § 2050 at 326–28. The grant of a new trial falls within the rubric of "other action" and has been employed by other courts. *See Voegeli v. Lewis*, 568 F.2d 89 (8th Cir.1977); *Newsum v. Pennsylvania R. Co.*, 97 F.Supp. 500 (D.C.N.Y.1951); *Aulgur v. Zylich*, 390 S.W.2d 553 (Mo.App.1965); *Abbatemarco v. Colton*, 31 N.J.Super. 181, 106 A.2d 12 (1954). This court has held that a new trial may be granted when the trial was unfair or where such action is necessary to prevent substantial injustice. *See Bell v. Westinghouse*, 483 A.2d 324, 327 (D.C.1984); 11 WRIGHT & MILLER, *supra*, § 2058 at 37–38.

■ In *Voegeli v. Lewis, supra*, 568 F.2d at 89, a case comparable to the one at bar, the trial testimony of an expert witness called by the defendants in a medical malpractice suit directly contradicted his deposition testimony. The plaintiffs had not been advised of his change of position. The jury returned a verdict in favor of the defendants and the trial court denied the plaintiff's request for a new trial. Finding a violation of the duty of supplementation and that the testimony was "in many respects pivotal," the reviewing court held that the "resulting surprise testimony could only have prejudiced appellants in presenting their case" and remanded for a new trial. *Id.* at 96.

Appellants, in this case, received similar unfair surprise where pivotal evidence was lost and as a result they were denied the opportunity to conduct their case on equal footing with appellee. Appellee constructed its entire defense with full knowledge that the object was missing. Appellants, on the other hand, conducted their case believing that the object would be available for the examination of their expert witness. We agree with appellants that notice of the missing evidence at the beginning of trial would have allowed time to alter their strategy. At the very least, notice would have prevented appellee from pursuing a "footprint" defense without objection.

The trial court stated that appellants suffered no prejudice because they "plainly exaggerated the significance of the missing evidence in the context of the entire trial." As we have suggested, the object was a critical issue for both parties. The footprint defense was central to appellee's argument that the object was not in the eye at the time of the examination. On the other hand, the expert's in-court examination of the object was the only available means for appellants to mount their planned attack on the footprint defense.

Appellants admitted that they could not state with certainty that the shape of the object would conclusively establish their rebuttal argument. This, however, provides no support for the trial court's conclusion that appellants could show no specific prejudice. Appellants were placed in a catch-22 position of being unable to demonstrate the prejudice without recourse to the object itself while being deprived of the object. Because appellee's action denied appellants the opportunity to establish the specific prejudice they suffered, it is appellee who must bear the onus of the error. *Winter v. Brown*, 365 A.2d 381, 385 (D.C.1976). "[W]here one of two innocent persons must suffer, the misfortune should rest on the person responsible for a fault and who had it in his power to avert it." *Davis v. Sheriff*, 81 A.2d 344, 347 (D.C.1951), *cited in Winter, supra*, 365 A.2d at 385 n. 7. Accordingly, we find that the trial court's findings of fact regarding the importance and prejudice of the lost evidence to appellants were clearly erroneous and its refusal

to grant a new trial was an abuse of discretion.

## IV

In sum, we hold that appellee acted with gross indifference and reckless disregard by removing the object for testing and, under our dictates in *Battocchi*, an adverse inference instruction was mandated. Moreover, the unique circumstances of this case compel the conclusion that the court abused its discretion by refusing to give the instruction. Finally, appellee's failure to disclose the loss of the evidence at the beginning of trial was in derogation of its duty to supplement discovery material crucial to the case and created such substantial prejudice that appellants were denied a fair trial. Accordingly, we remand for a new trial.

*So ordered.*

FARRELL, Associate Judge, dissenting.

I agree that the trial judge erred in declining to give the missing evidence instruction in the circumstances of this case. I disagree, however, that the error was sufficient to warrant vacating the judgment and requiring this case to be retried. I therefore respectfully dissent.

I agree with the finding of error reluctantly because, as *Battocchi* makes clear, "a finding by the trial court as to the degree of fault of a party in failing to produce or preserve evidence will not be disturbed unless clearly erroneous." 581 A.2d at 767. Moreover, *Battocchi* did not recede from this court's prior expressions of "skepticism about the missing witness/evidence doctrine," *id.* at 766, and "the dangers inherent in creating evidence from nonevidence." *Id.* at 765 (citation omitted). Nevertheless, the present record leaves me with the definite and firm conviction, sufficient to overcome our deferential standard of review, that the hospital's conduct "transcend[ed] ordinary negligence, and evidence[d] at least knowing disregard of the importance of the [metal fragment] to [the] opposing litigant's claim," *id.* at 766. In *Battocchi*'s ultimate formulation, it displayed "gross indifference to or reckless disregard for the relevance of the evidence to a possible claim." *Id.* at 767.

Hospital officials were on constructive and even actual notice that plaintiffs had sought production of the metal fragment in discovery and, indeed, that it had been produced and made available for Dr. Mitchell's deposition, after which the hospital had been entrusted with its custody. The hospital also knew that liability in this case centered about the negligence *vel non* of its physician in not detecting the presence of the metal fragment, and thus that the size and configuration of the object might be an issue. Specifically, the hospital knew that at least part of its defense would be to require plaintiffs to prove that the fragment was actually in Mr. Williams' eye at the time of Dr. Mitchell's examination, despite the absence of markings in the eye showing the entry of such an object. *See* Defendant's Pretrial Statement ("Defendant contends that the foreign object found in Mr. Williams' eye on June 12, 1987, *if present* [emphasis in original] on February 2, 1987, was difficult to discern or diagnose through examination"; "Mr. Williams presented no symptoms on February 2, 1987 which would have led any competent examining physician to diagnose a foreign body in his eye"). Yet, despite the relevance of the fragment to the hospital's liability generally and its anticipated "footprint" defense in particular, the hospital allowed its doctors, sometime before trial but after production of the object in discovery, to remove the fragment from its place in the medical record and subject it to testing for "radiopacity." I readily concede that the doctors did not do so intending to destroy the fragment or otherwise make it unavailable to plaintiffs. Indeed, they consulted with counsel for the hospital in this litigation before removing it. But therein lies a considerable portion of the rub.

According to counsel for the hospital, the doctors wanted to see if "some kind of testing [could be] set up to see what the iron content was of [the fragment]." Counsel told them, however, "We can't do that. That may take the place of destruc-

tive testing. Don't do that." The doctors then asked, "Can you find out what the hammer and chisel were so we can judge that metal?" to which counsel replied, "To do that is destructive testing. We can't do that without telling the other side." So the doctors settled on an x-ray to determine if the object was "radiopaque" or visible by x-ray. Yet counsel for the hospital had always believed "x-ray was not an issue" in the case and hence was "not even sure why they wanted to know if it was radiopaque." Besides forbidding them to do "corrosive testing," therefore, he gave them no green light to test for radiopacity: "That's why I didn't tell them to do it; it's not an issue in the case." Still the testing went forward and the fragment was lost in a way no one could later explain.

In these circumstances, even without evidence of intent to destroy the fragment or gain some unfair advantage over the plaintiffs, I cannot reasonably conclude that the loss of the fragment was only an ordinary lapse from the standard of proper care. To so hold on these facts would allow "ordinary negligence" to absorb the whole range of fault, excluding only deliberate destruction or subjective "bad faith" or ill-will. For better or worse, hospitals such as the Washington Hospital Center are regular litigants in Superior Court defending malpractice suits. It is reasonable to assume they know the importance of safeguarding records and exhibits in their custody related to pending litigation. When in addition their own counsel in litigation, at the very least, has warned them of the danger of performing tests on so easily lost or destroyed an object as a minute metal fragment and raised the advisability of prior court clearance, there is no justification for the doctors to have proceeded as they did in this case. As hospital counsel effectively conceded in argument before the trial court, advance clearance with the court would have allowed the issue of need for the testing to be fully aired—in circumstances where counsel himself questioned the relevance of the test to this litigation. And even if the testing were allowed, permission by the court might have been conditioned on safeguards to preserve the integrity of the object beyond the apparently routine measures that failed here. I therefore agree with the majority that the hospital's conduct demonstrated "gross indifference to . . . the relevance of the evidence to a possible [indeed, an actual] claim," *Battocchi*, 581 A.2d at 767, leaving the trial judge no choice but to give the missing evidence instruction.

On the record in this case, however, I am convinced that the failure to give an adverse inference instruction was harmless error. First, appellants' claim of prejudice is their inability to have their expert, Dr. Elman, examine the metal fragment in connection with his testimony at trial refuting the hospital's "footprint" defense. Yet appellants never attempted to have Dr. Elman examine the fragment until he was poised to testify at trial as virtually the last witness in the case.[1] Trial counsel for plaintiffs were able and experienced; they litigated this case thoroughly and aggressively. It is all but inconceivable to me that if they (1) regarded refutation of the footprint defense as a critical aspect of Dr. Elman's testimony and (2) considered his opinion on that issue to depend critically on actual examination of the fragment, they would have put him on the stand without previously attempting to have him examine the evidence. This fact by itself, in my view, supports the trial judge's post-trial finding that plaintiffs had "exaggerated the significance of the missing evidence in the context of the entire trial."

Second, the record reveals that in lieu of the evidence it had lost, the hospital was willing to stipulate to the configuration of the fragment, specifically to the fact that it was long and narrow and three-dimensional. This would have furnished a basis for Dr. Elman's opinion that "if the object was long and narrow it is unlikely to have transected a blood vessel, and have left a visible 'footprint' " (post-trial affidavit of Dr. Elman). Indeed, even without the stipulation, Dr. Elman described the fragment at trial as "like having a little needle in the

---

**1.** Dr. Elman testified out of turn.

eye. You may not be able to see a mark on the outside of the eye." He was not cross-examined by hospital counsel in a manner implying the fragment was any other shape.[2] Plaintiffs never asked Dr. Elman whether the unavailability of the fragment impaired his ability to form an opinion whether it would have left footprints. And similarly, although the trial judge ruled that plaintiffs' counsel could not argue the adverse inference in closing argument, the record does not suggest that he barred them from pointing out that any weakness in the foundation of Dr. Elman's opinion stemmed from the unavailability of the fragment owing to its loss by the hospital.

Finally, although the judge did not instruct on the adverse inference, he made clear to the jury who had caused the fragment to disappear:

> Now at various times you may have been wondering where the object is that was removed from Mr. Williams' eye by Dr. Perrault during his surgery on June 12, 1987. At one point that object was preserved as part of the hospital's medical record for this patient. At some point along the way between then and now, however, the hospital removed the foreign body from the record to do an analysis of it and thereafter it was apparently never returned to the original record. Therefore, no witness for the plaintiff or for the defendant at this trial was able to look at the actual object and testify about its size or shape or other characteristics. It is at this point simply unavailable to both sides, and the parties and witnesses have had to base their testimony on descriptions of the object contained in the medical records.

Hence, if the jury was troubled by its own (or any expert's) inability to inspect the fragment in evaluating the footprint defense, it knew whom to blame for the loss.

2. The trial judge indicated that, in view of the loss of evidence, he likely would not have allowed any such impeachment.

3. For reasons similar to those stated, I also reject the majority's conclusion that the hospital's failure to "seasonably amend" its response to discovery by informing plaintiffs earlier of the lost evidence compelled the extreme remedy

In these circumstances, I am not convinced that the error in failing to instruct further on the missing evidence justifies setting aside the verdict in this complex civil trial.[3]

of a new trial. In any event, my reading of the record indicates that at trial plaintiffs requested only a missing evidence instruction, not a mistrial; not until their reply to the hospital's opposition to their post-trial motion for a new trial did they assert that only a new trial could have repaired the discovery breach.