**STRUCTURAL PRESERVATION SYSTEMS, INC., Appellant,**

v.

**David PETTY, Appellee.**

**No. 02–CV–1147.**

District of Columbia Court of Appeals.

Argued Dec. 15, 2003.

Decided June 21, 2007.

Thomas Ramsey Mooers, for appellant.

Fred B. Goldberg, with whom Julian H. Spirer, Bethesda, MD, was on the brief for appellee.

Before FARRELL, Associate Judge, and WAGNER and SCHWELB, Senior Judges.*

PER CURIAM:

In this suit for negligence against appellant, Structural Preservation Systems, Inc. (Structural), a jury awarded appellee, David Petty, damages in the amount of $150,000 related to injuries he sustained at his workplace when he tripped and fell over a metal plate in an area where Structural was performing repairs. Structural argues for reversal on the grounds that the trial court erred in: (1) permitting Petty's treating chiropractor to testify to expert opinions beyond the scope of her treatment of Petty without having designated her as an expert witness; (2) failing to require Petty to apportion his injuries, given his pre-existing injury; and (3) permitting Petty's chiropractor to render opinions beyond the scope of her own expertise. Finding that some of Petty's treating chiropractor's opinion testimony exceeded the permissible bounds of her expertise and treatment, we reverse and remand for a new trial on damages.[1]

## I.

Structural argues that the trial court erred in allowing Petty's treating chiropractor, Cathlyn Hartung, to testify as to opinions she formulated for purposes of the litigation, rather than for the purpose

---

* At the time of argument, Judge Wagner was Chief Judge of the Court and Judge Schwelb was an Associate Judge.

1. Structural does not challenge the jury's finding that Petty's trip-and-fall accident was caused by its negligence. Therefore, liability in that regard remains established.

of treating Petty. Specifically, Structural contends that Dr. Hartung should not have been permitted to render opinions concerning Petty's treatment by the physicians and physical therapist who treated him before he came under her care, the necessity for such treatment and the reasonableness of the charges for their services. Structural argues that such testimony amounted to expert testimony requiring that Petty identify Dr. Hartung as a witness under Super. Ct. Civ. R. 26(b)(4). Petty argues that compliance with Rule 26(b)(4) was not required in order for Dr. Hartung to render an opinion with respect to causation and his prognosis for future pain and suffering. He contends that it was permissible for Dr. Hartung to refer to other treating physicians' records in developing her opinions as long as they were obtained in order to provide treatment, as they were here. Petty also responds that Dr. Hartung's testimony concerning his medical expenses is inconsequential because it was within the trial court's discretion to admit such evidence without expert testimony.

### A. *Applicable Legal Principles*

■ Pursuant to Super. Ct. Civ. R. 26(b)(4), a party has the right to discover prior to trial the facts and opinions of an expert "acquired or developed in anticipation of litigation or for trial. . . ." Opinions developed by an expert in the course of a patient's treatment and those developed in preparation for litigation are treated differently under Rule 26(b)(4). "Insofar as a physician obtains and develops his information and opinions in the course of his treatment of a patient, he becomes an 'actor or viewer' who should be treated as an ordinary witness rather than as an expert covered under Rule 26(b)(4)." *Adkins v. Morton,* 494 A.2d 652, 657 (D.C. 1985) (citations omitted); *see also Safeway Stores, Inc. v. Buckmon,* 652 A.2d 597, 606 (D.C.1994) (holding that a physician witness was not an expert subject to Rule 26(b)(4)'s requirements where his opinions were acquired during the course of the patient's treatment).

■ In determining whether the witness must be disclosed under Rule 26(b)(4), the focus is not merely on whether the witness has been identified as a treating physician, "but rather on the substance of the testimony." *Patel v. Gayes,* 984 F.2d 214, 218 (7th Cir.1993) (citation omitted).[2] Federal courts construing the comparable federal rule have held that a treating physician must be disclosed as an expert where the treating physician's opinion is based upon medical records not viewed in the course of treatment.[3] *See id.* (holding treating physicians' opinions on standard of care were classic expert testimony formulated for litigation and not for treatment, and therefore, properly excluded for lack of compliance with Rule 26(b)(4)); *Riddick v. Washington Hosp. Ctr.,* 183 F.R.D. 327, 331 (D.D.C.1998) (noting that treating physician's opinion on causation and injury would be excluded for non-compliance with Rule 26(b)(4) if based on review of another health care provider's records for litigation, rather than treat-

**2.** *See* JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE, § 26.23[2][b][iii] (3d ed. 2003) ("In practice, it is not always easy to determine when a treating physician will . . . cross the line into becoming a specially retained expert whose report must be provided under the Rule.").

**3.** Since the language of Rule 26(b)(4) is identical to its federal counterpart, "we may look to federal court decisions interpreting the federal rule as persuasive authority in interpreting the local rule." *Williams v. United States,* 878 A.2d 477, 482 (D.C.2005) (citations and internal quotation marks omitted).

ment purposes). Generally, " '[d]ecisions regarding the scope and the conduct of discovery will be reversed only upon a showing of abuse of discretion.' " *Hollins v. Federal Nat'l Mortgage Ass'n,* 760 A.2d 563, 579 (D.C.2000) (quoting *Dalo v. Kivitz,* 596 A.2d 35, 36 n. 1 (D.C.1991)); *see also Regional Redevelopment Corp. v. Hoke,* 547 A.2d 1006, 1008 (D.C.1988) ("Whether or not an expert who is not listed in an interrogatory can testify is within the wide discretion of the trial court."). Applying these general principles, we consider Structural's specific claims.

### B. *Analysis*

■ Structural argues that Dr. Hartung's testimony as to the reasonableness of the cost of an MRI and the reasonableness of the need and fees for Petty's physical therapy exceeded the bounds of the treating physician exception to Rule 26(b)(4)'s designation requirement. Petty responds that both the MRI report and the report of Dr. Kahanovitz, which indicated Petty's need for physical therapy, were reviewed by Dr. Hartung in the course of her treatment of Petty, and therefore fall within the treating physician exception. A treating physician can render opinions as long as those opinions are based on facts encountered in treatment. *See Adkins, supra,* 494 A.2d at 657. In fact, Dr. Hartung testified that she relied on both the MRI report and Dr. Kahanovitz's report in forming her treatment plan for Petty. Therefore, according to her testimony, her opinion was based on information reviewed during the course of treatment. However, that simple recitation does not end the inquiry. The question is whether the substance of the opinion is of the type that would be formulated for treatment purposes or prepared in anticipation of litigation. *See Patel, supra,* 984 F.2d at 218 (citation omitted) (noting that the focus of the inquiry for purpose of determining Rule 26(b)(4)'s disclosure requirements should be on the substance of that testimony).

■ Structural argues that Dr. Hartung should not have been allowed to testify that Dr. Kahanovitz's opinion that Petty needed physical therapy was correct. We agree that a treating physician's opinion as to the correctness or incorrectness of another treating physician's opinion tends to be of the type associated with preparation for litigation, rather than simply treating the patient. "[A] treating physician requested to review medical records of another health care provider in order to render opinion testimony concerning the appropriateness of the care and treatment of the provider would be specifically retained notwithstanding that he also happens to be the treating physician." *Brown v. Best Foods,* 169 F.R.D. 385, 389 (N.D.Ala.1996) (quoting *Wreath v. United States,* 161 F.R.D. 448, 450 (D.Kan.1995), and also citing *Patel, supra,* 984 F.2d at 218). Simply because one is a treating physician does not mean that he or she cannot hold opinions arising in the course of a patient's care and treatment and at the same time develop expert opinions solely for purposes of the trial. When the expert does the latter, it appears to be a reasonable requirement that such opinions be disclosed under Rule 26(b)(4).

■ Thus, unless relevant to his or her own treatment decisions, a treating physician or other healthcare expert may not testify as to the propriety of decisions and treatment provided by other healthcare professionals, even if the opinion is formulated from materials reviewed during the treatment process. Applying that principle, Dr. Hartung should not have been permitted to testify about the appro-

priateness of Dr. Kahanovitz's recommendation for physical therapy. Although she reviewed his treatment plan in the process of forming her own approach to treatment, Dr. Hartung's commentary on whether physical therapy was necessary exceeded permissible bounds. Absent some indication that it was necessary for Dr. Hartung to evaluate the reasonableness of Dr. Kahanovitz's care in order to form her own treatment plan, allowing her to testify about the reasonableness of another doctor's treatment has the earmarks of expert testimony that was prepared for litigation purposes. Therefore, absent compliance with the requirements of Rule 26(b)(4), it should not have been admitted. A similar result obtains with respect to Dr. Hartung's testimony as to the reasonableness of the fees charged for an MRI and physical therapy rendered by others. While she could testify about the reasonableness and necessity of the bills for her own treatment, her testimony about such matters as related to other doctors exceeded the permissible scope of the treating physician exception.[4]

## II.

Structural next argues that the trial court erred in allowing the case to be submitted to the jury where there was no expert testimony from which the jury could determine whether the cause of Petty's injury and damages was related to the trip-and-fall accident or his complicated, pre-existing medical condition. Structural contends that the trial court erred in holding that it did not adequately raise the issue pre-trial where it disputed the proximate cause of Petty's injuries, preserved all objections to medical bills and cited in its pre-trial statement cases addressing the apportionment doctrine. Petty responds that the testimony of his treating chiropractor was sufficient to prove that he sustained a new and separate injury as a result of Structural's negligence, rather than an aggravation of a pre-existing injury, and that the accident was the primary cause of his injury and damages.

### A. Applicable Legal Principles

In cases presenting medically complicated questions of causation because of multiple and/or pre-existing causes for a plaintiff's injuries, expert testimony is required to avoid jury speculation. *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C.1988) (citing *Gray Line, Inc. v. Keaton*, 428 A.2d 360 (D.C.1981)). Absent expert testimony, a jury will not be permitted to consider the causal connection between a plaintiff's claimed injury and a

---

**4.** Petty does not argue harmless error expressly. He contends that expert testimony was not necessary to establish his damages. We have stated that "in a suit in tort for personal injury the plaintiff makes a *prima facie* case by proving the professional services rendered and the amount of the bill paid or incurred." *Giant Food Stores, Inc. v. Bowling*, 202 A.2d 783, 784 (D.C.1964) (citation and quotation marks omitted). Nevertheless, whether expert testimony was needed or not, expert testimony was provided on the issue here. Such testimony from a medical professional comes with some persuasive force that might not be the same with the testimony of a lay person. Therefore, we cannot say that the error was harmless on that basis.

Petty also asserts that Structural cannot claim error from Dr. Hartung's testimony concerning the reasonableness of the MRI bill because Structural opened the door to it. Structural's counsel did engage in extensive questioning about the MRI report, thereby arguably opening the door to allow Dr. Hartung to testify beyond her expertise on this point. *See infra*, Part III. However, opening the door to testimony that might be beyond the doctor's expertise is not co-extensive with opening the door for purposes of her rendering an opinion concerning the necessity for another physician's treatment or the reasonableness of his bills for services rendered. Therefore, we reject this argument.

defendant's negligence unless: "(1) the [injury] first emerged coincidentally with or very soon after the negligent act, or (2) the [injury] was of a type which by its very nature reflected its cause, or (3) the cause of the injury related to matters of common experience, knowledge, or observation of laymen." *Id.* (citing *Early v. Wagner*, 391 A.2d 252, 254 (D.C.1978)) (other citations omitted).

## B. *Analysis*

 We consider first Structural's procedural claim that the trial court erred in rejecting its argument that Petty should be required to apportion his pre-existing injuries because it was not raised in its pre-trial statement and included in the pre-trial order. The pre-trial order limits the issues for trial and controls the subsequent course of the action, thereby precluding the interjection of new issues, absent modification of the order upon good cause. *See Habtu v. Woldemichael*, 694 A.2d 846, 849 (D.C.1997) (citations omitted); *see also* Super. Ct. Civ. R. 16(g) (setting forth the general subject of the pre-trial order and stating that it controls further proceedings unless subsequently modified). However, we cannot say on this record that Structural did not raise the apportionment issue pre-trial. Although not expressly characterized as such, Structural cited cases upon which it relied that address the issue, specifically, *Williams v. Patterson*, 681 A.2d 1147, 1150–51 (D.C.1996) (holding the lack of expert medical evidence to be fatal to plaintiff's proof where the case involved a complicated medical question due to pre-existing medical condition), and *Baltimore, supra*, 545 A.2d at 1231–32. It also disputed that Petty's alleged damages were

proximately caused by its alleged negligence. The causation issue bears a reasonable relationship to the apportionment argument. The question of whether Petty's pre-existing hip injury caused his back pain, rather than the trip-and-fall, falls squarely within the causation analysis. Thus, Structural's claim that Petty should be required to prove that his injuries were caused by his accident, rather than some prior condition, can be inferred reasonably from the parties' joint pre-trial statement, which was incorporated into the pre-trial order. Therefore, the trial court erred in holding that Structural's apportionment argument was barred procedurally by the pre-trial order.

Structural further argues that it was entitled to a directed verdict at the close of the evidence because Petty failed to present any evidence to assist the jury in resolving the question of causation. It contends that a medically complicated issue was presented as to whether Petty's back pain and related treatment was caused by his pre-existing avascular necrosis, or by the injury he sustained in the trip-and-fall accident, or both.[5] Structural argues that Petty failed to explain how, if at all, his back pain was aggravated by the accident. It contends that, absent Petty's presentation of apportionment evidence, the jury was confused on the issue, and therefore must have awarded Petty an amount to compensate him for future treatment for both injuries. Structural cites evidence that before the accident, Petty suffered from a condition known as avascular necrosis in both hips and "end stage arthritis" that had progressed to the point that he needed hip replacement. According to Structural's expert at trial, Dr. Epps, all of Petty's orthopaedic surgeons (Dr. Kahano-

---

**5.** Avascular necrosis was explained to be a condition that occurs when the supply of blood to the hip joint is interrupted and causes the head of the femur to flatten and prevent normal functioning of the ball and joint in the pelvis.

vitz, Dr. Levitt, Dr. Henahan, and Dr. Glassman) recognized Petty's hip condition and that his back complaints were related to arthritis in the hip. Further, Dr. Epps testified that Petty's back pain was not related to the accident, but rather to his pre-existing hip condition.[6]

First, contrary to Structural's argument, it does not appear from the complaint or the evidence presented by Petty that he was claiming damages based upon an aggravation of his pre-existing hip condition. Petty's complaint states only that, as a result of the accident, he "sustained multiple injuries, pain, suffering, trauma and mental anguish." According to Petty's testimony, he felt pain in his hip for only a brief period of two weeks after the accident, although his back continued to hurt up until the time of trial. Dr. Hartung testified about Petty's ongoing back pain. Finally, Petty sought damages for medical expenses related only to the doctors who treated his back condition. He did not introduce evidence or seek recovery for services rendered by Dr. Glassman, who limited his treatment solely to Petty's hip condition.

Second, although Structural presented strong evidence tending to show that Petty's back condition was related to his pre-existing hip condition, Petty presented some evidence that his back condition was a new one caused by the trip-and-fall accident. In *Baltimore,* this court noted that an injury can be considered "new" where "the disability first emerged coincidentally with or very soon after the negligent act." *See* 545 A.2d at 1231 (citation omitted).

Although Petty did have a pre-existing hip condition which was capable of causing back pain, there is no evidence that the condition had ever caused him back pain prior to the accident. The absence of any testimony connecting Petty's back pain to his hip before the accident indicates that the back pain emerged very soon *after the negligent act,* and not prior to it. Therefore, there is a strong argument that Petty's back injury was a new one, caused by, rather than aggravated as a result of, Structural's negligence.[7]

Finally, Dr. Hartung's testimony was sufficient to allow a jury to find that Structural's negligence played a substantial part in bringing about Petty's back injury. *See Baltimore, supra,* 545 A.2d at 1231–32. That requires evidence from which the jury can find that "the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries," *see id.* at 1232 n. 6 (citations omitted), or that "the likelihood of one cause is greater than any other," *see id.* (citations omitted), or can "differentiate between a present medical condition and a pre[-]existing one in evaluating the causal role of an intervening accident," *see Williams, supra,* 681 A.2d at 1150. In other words, the jury simply needs to know that the accident, rather than the prior ailment, was the primary cause of the current condition. In the present case, Dr. Hartung's testimony was sufficient to meet that requirement. When asked whether she had an opinion to a reasonable degree of chiropractic certainty as to whether Petty's back pain was

**6.** Dr. Epps also testified that Petty's legs were different lengths because the head of his right femur had collapsed because of the avascular necrosis which was unrelated to the trip-and-fall accident.

**7.** *Cf. Williams, supra,* 681 A.2d at 1150 ("The law is settled that where an accident *does not*

*cause* a diseased condition, but only aggravates and increases the severity of a condition existing at the time of the accident, such party could only recover for such increased or augmented sufferings as were the natural and proximate result of the negligent act.") (emphasis added, citations omitted).

the result of his trip-and-fall, Dr. Hartung stated that the fall had damaged several areas of Petty's back and "[t]hat is the *primary cause* of his problem." Her testimony in this regard is sufficient to prove that the accident "played a substantial part" in causing the current condition, rather than just having a minor or secondary impact.[8]

Structural maintains that the doctor should have further delineated her testimony to account for the impact the hip condition had on Petty's back pain. Dr. Hartung admitted that Petty's pain was "multifactorial." Nevertheless, the record is clear that although the doctor acknowledged that avascular necrosis could cause back pain, she concluded, based on Petty's history, account of the accident, and her examination, that the hip condition was not the primary cause of Petty's continuing back pain. Although Structural might prefer a further mathematical itemization, this court has expressly stated that "we [do] not imply that an expert would have to quantify—in percentage terms—the degree to which the accident worsened the prior condition, so long as the expert [can] 'differentiate between a present medical condition and a preexisting one in evaluating the causal role of [an] intervening accident.'" *McLeish, supra* note 8, 746 A.2d at 895 n. 2 (quoting *Williams, supra,* 681 A.2d at 1150). Since Dr. Hartung clearly expressed her opinion that the accident was the primary cause of Petty's injury, there was sufficient evidence under *Williams* and *McLeish,* for the jury to so find. Therefore, we find no error in the court's refusal to require Petty to offer apportionment evidence.

---

**8.** Structural further challenges Dr. Hartung's conclusion on the ground that she was the only medical professional to connect Petty's back pain to the accident. However, this

## III.

Structural argues that the trial court erred in permitting Dr. Hartung to render opinions beyond the scope of her own expertise. Structural does not dispute that Dr. Hartung "was generally qualified to testify within the scope of the field of chiropractic." However, Structural contends that Dr. Hartung exceeded the limits of her area of expertise by testifying (1) that Petty would require nerve block injections; (2) that his condition was related to his back, rather than avascular necrosis; (3) that the MRI results showed longitudinal innervation; and (4) that Dr. Kahanovitz's order for Petty to have physical therapy was reasonable and necessary. In response, Petty argues that Dr. Hartung is a licensed chiropractor and physical therapist, and therefore, qualified to testify about the need for physical therapy. Petty also contends that most of the testimony about which Structural complains was offered when Structural opened the door to it on cross-examination.

### A. *Applicable Legal Principles*

 This court has stated frequently that:

> The decision to admit expert testimony is within the broad discretion of the trial court, and a ruling either admitting or excluding such evidence will not be disturbed unless manifestly erroneous.... This court must determine, from the record on appeal, whether the trial court failed to exercise its discretion with reference to all the necessary criteria in admitting or excluding expert testimony.... The "necessary criteria" ... include evaluating the competence of the proffered expert witness ... *assuring*

argument "goes to the weight of her testimony rather than its legal sufficiency." *See McLeish v. Beachy,* 746 A.2d 892, 896 (D.C. 2000).

that the witness' testimony does not exceed the scope of the expert's qualifications approved by the court, and ... preventing an expert witness from preempting the function of the jury. *Gonzalez v. United States,* 697 A.2d 819, 826 (D.C.1997) (quoting *Gant v. United States,* 518 A.2d 103, 109–10 (D.C.1986) (internal alterations and quotation marks omitted), and citing *United States v. Alonso,* 48 F.3d 1536, 1540, 1541 (9th Cir.1995)) Treatises have also noted that, although a witness is qualified as an expert in a particular field, that same witness may be precluded from providing opinions that exceed the scope of his or her expertise.[9] Although apparently not previously addressed by this court or by statute,[10] other courts appear to hold that a chiropractor is allowed to provide expert testimony that is related to his or her area of practice, and the area of practice is generally defined by resort to the statute which delineates the confines in which chiropractic practitioners must operate. *See, e.g., Tucker v. American Tel. & Tel. Corp.,* 794 F.Supp. 240, 245 (W.D.Tenn.1992) (noting that "a chiropractor is competent to testify as an expert as to matters within the limited scope of his profession" and that the scope was defined by statute) (citation omitted); *Horowitz v. American Motorist Ins. Co.,* 343 So.2d 1305, 1307–08 (Fla.Dist.Ct.App.1977) (noting that the "definition and scope of permitted practice of a chiropractor" was set forth by statute and chiropractor could provide expert testimony as to "injuries that are within the ambit of chiropractic discipline"); *McCaffrey v. Puckett,* 784 So.2d 197, 202 (Miss.2001) (noting that chiropractors are "competent to give expert testimony within the limited scope of the practice of chiropractics" and turning to statute to define chiropractics) (emphasis omitted). Applying that guidance to this jurisdiction, a chiropractor in the District of Columbia should be allowed to provide expert testimony as to the practice of chiropractic, which is defined as follows:

"Practice of Chiropractic" means the detecting and correcting of subluxations that cause vertebral, neuromuscular, or skeletal disorder, by adjustment of the spine or manipulation of bodily articulations for the restoration and maintenance of health; the use of x-rays, physical examination, and examination by noninvasive instrumentation for the detection of subluxations; and the referral of a patient for diagnostic x-rays, tests, and clinical laboratory procedures in order to determine a regimen of chiropractic care or to form a basis or referral of patients to other licensed health care

9. *See, e.g.,* 32 C.J.S. *Evidence* § 526 (1996) ("While a witness may be an expert in one field, he may not necessarily be an expert in another field, even though that field is closely related, and it is impermissible for an expert to render an opinion which requires special expertise in a discipline other than that in which he is shown qualified.") (internal footnotes omitted); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 702.04[6] (Joseph M. McLaughlin ed., 2d ed. 1997 & 2003 Supp.) ("[E]ven though [an expert] witness might possess credentials to render some expert opinions, the trial court may, and perhaps must, exclude on grounds of disqualification any testimony that extends

beyond the witness's demonstrated expertise.").

10. Some states have statutes specifically delineating the subjects on which a chiropractor can provide expert testimony. *See, e.g.,* Del. Code Ann. tit. 24, § 717(a) (2003) (noting that chiropractors "shall be deemed competent to offer opinions" in courts and administrative agencies on the issue of causation so long as the testimony is "within the scope of chiropractic practice" and the opinion is given "to a reasonable degree of chiropractic certainty"); N.C. Gen.Stat. 90–157.2(1) (1989) (noting that chiropractors can provide expert testimony as to a disability "within the scope of chiropractic" as defined by state statute).

professionals. "Practice of Chiropractic" does not include the use of drugs, surgery, or injections, but may include, upon certification by the Board, counseling about hygienic and other noninvasive ancillary procedures authorized by rules issued pursuant to this chapter.

D.C.Code § 3–1201.02(3)(A) (2001).

## B. *Analysis*

■■■ First, we reject Structural's argument that Dr. Hartung's testimony regarding injections was beyond the scope of her expertise. Structural's argument focuses on the fact that the practice of chiropractic does not include the administration of injections. Although this is true, *see* D.C.Code § 3–1201.02(3)(A), in this case Dr. Hartung testified that Dr. Bovell had written a prescription for the nerve blocking injections. Consequently, Dr. Hartung's testimony in this regard is more in the nature of fact rather than opinion. Moreover, since chiropractors are allowed to refer patients to other doctors under the statute, *see id.*, and Dr. Hartung made such a referral, it was permissible for her to testify as to why she referred the patient to Dr. Bovell for injections.

■■■ Similarly, Structural cannot prevail on its argument that Dr. Hartung exceeded the bounds of her expertise by contradicting licensed medical doctors about the cause of Petty's injury and pain. The thrust of Structural's claim here appears to be that since Petty's avascular necrosis predated his injury from the trip-and-fall accident, and Dr. Hartung was not licensed to treat that condition, she could not testify that it was not the cause of Petty's back pain. Although Dr. Hartung was not qualified to diagnose avascular necrosis without going beyond her experience as a chiropractor, she could state that

based on her examination and what Petty told her, his injury and pain were attributed to his back. Although Dr. Hartung may not have had the expertise to testify about how avascular necrosis affected Petty's back, that limitation should go to the weight, rather than the admissibility, of the testimony that she did provide. *See Brooks v. Friedman*, 769 N.E.2d 696, 702 (Ind.Ct.App.2002) ("The finder of fact is entitled to weigh and determine the credibility to be accorded the expert's opinion based on the evidence presented, including the extent of the witness' experience and expertise, the reliability of the analytical methods employed, and the degree of certitude with which the opinion is cast.").

■■■ Structural is partially correct with regard to its argument that Dr. Hartung should not have testified as to her interpretation of the MRI.[11] Indeed, Dr. Hartung testified that she was not trained to read an MRI and that she relied on MRI reports to explain the results for her. Despite these admitted limitations, Dr. Hartung testified about what she saw in the MRI, stating that "the longitudinal ligament is deeply innervated and it can—and it is—the small disk protrusion presses on that ligament." However, this testimony was elicited by Structural's counsel on cross-examination when he asked Dr. Hartung how the MRI had influenced her opinion. Since Structural invited the error, it cannot now profit from it. *See, e.g., Gonzalez, supra*, 697 A.2d at 826 (no reversal for plain error because the testimony that defendant claimed was "highly prejudicial" was elicited "by defense counsel during his cross-examination of the expert witness" and was therefore "invited" by the defense).

---

11. The testimony on cross interpreting the MRI beyond what was stated in the report is distinguishable from the testimony about the MRI report that was elicited on direct.

 Finally, Structural argues that Dr. Hartung should not have been allowed to testify that the physical therapy ordered by Dr. Kahanovitz was reasonable and necessary. To the extent that Structural is referring only to the amount of the bills, we reject its argument. In addition to being a chiropractor, Dr. Hartung is a licensed physical therapist. As such, testimony regarding the amount of the physical therapy bills would not be beyond the scope of her expertise, even if beyond the scope of her treatment. However, to the extent that Structural is claiming that Dr. Hartung's commentary as to whether physical therapy was necessary went beyond her field, it has a valid point. Although Dr. Hartung was licensed to *provide* physical therapy, there is no indication in the record that she was allowed to *order* or *prescribe* physical therapy. The applicable statute does not indicate that physical therapists are allowed to order therapy on their own. On the contrary, the statute provides that physical therapists can only evaluate or treat injuries "on the prescription of or referral by a licensed physician" or other listed health professional. *See* D.C.Code § 3–1201.02(12). Similarly, although chiropractors can refer patients to others for care, *see id.* § 3–1201.02(3)(A), chiropractors are not among the health professionals listed in the statute who can prescribe physical therapy. *See id.* § 3–1201.02(12) (listing among those qualified to order physical therapy are "licensed physician, osteopath, dentist, or podiatrist, or . . . advanced registered nurse," but not a chiropractor). Since it appears that Dr. Hartung could not prescribe physical therapy on her own authority, her testimony exceeded the limitations of her expertise in this area. *See Sebroski v. Unit-*

*ed States,* 111 F.Supp.2d 681, 684 (D.Md. 1999) (where chiropractor was not authorized to order an MRI, his testimony about the reasonableness of the MRI fees was "beyond his area of training and expertise"). Thus, the testimony regarding the propriety of Dr. Kahanovitz's referral was allowed erroneously. This error, along with the error described in Part I of the opinion, requires reversal for a new trial on damages.[12]

For the foregoing reasons, the judgment of the trial court is affirmed on the issue of liability, but reversed and remanded for a new trial on the issue of damages only.

*So ordered.*

---

12. Since the testimony regarding Dr. Kahanovitz's report went to damages, rather than causation, no new trial is needed on liability.