Kendra BROOKS, et al., Appellants,

v.

**DISTRICT OF COLUMBIA HOUSING AUTHORITY, Appellee.**

**No. 07–CV–1159.**

District of Columbia Court of Appeals.

Argued June 3, 2009.
Re-argued May 11, 2010.
Decided July 22, 2010.

Joan A. Harvill for appellants.

Frederick A. Douglas, with whom Margaret McFarland, Washington, DC, Alex Chintella and Hans Froelicher, IV, Washington, DC, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and FARRELL, Senior Judge.

THOMPSON, Associate Judge:

After a five-day trial, a jury determined that defendant/appellee District of Columbia Housing Authority ("DCHA") was not responsible for injuries to five-year-old Sullivan Jackson (including burns to the child's hand and arm) caused by an electric shock she received after inserting a lamp plug into a wall outlet in the apartment she shared with her mother, Kendra Brooks. On appeal, Brooks and Jackson raise a number of claims of error with respect to the trial court's evidentiary rulings and jury instructions. As to those claims, which we shall discuss only briefly, we discern no error. Appellants also contend they are entitled to a new trial on the basis of documents that DCHA failed or refused to produce during discovery and trial—documents which DCHA acknowledged it possessed only in the course of post-trial Freedom of Information Act ("FOIA") proceedings, and which appellants acquired only after the trial court, upon a limited remand from this court, found that the documents were not protected from disclosure under the so-called "work product" doctrine.[1] We conclude that a remand is required so that the trial court may determine in the first instance whether a new trial is warranted in light of the newly produced documents.

I.

Appellants' theory at trial was that DCHA was negligent and breached its contractual obligations as landlord in allowing the walls of appellants' apartment to become water-logged, causing the wall outlet in question to emit a powerful electric current when Jackson plugged a lamp into the outlet on September 27, 2002. Brooks testified that, prior to and following the September 27, 2002 incident, she had experienced problems with water leakage and damage in the apartment. On or about June 2, 2002, Brooks discovered that "when you ran the bathtub upstairs, water would leak through the light fixture in the kitchen," causing a "flood" in her living room. She testified that a DCHA maintenance employee investigated the problem and discovered that, in addition to the leaking electrical lights, a pump

---

1. See Super. Ct. Civ. R. 26(b)(3) ("[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means").

in the pantry was spraying water, creating puddles in the living room and a pool that rose to the level of the baseboards in the pantry. The maintenance employee informed Brooks that "water at that level on the baseboards" indicated "buildup in the walls," and that the only solution was to tear the walls down. Following up on instructions she received from the maintenance employee and the residential manager, Brooks submitted a work order for DCHA to perform repairs and to plaster her walls. However, when the plasterer arrived, he made no repairs, reiterating that "the walls ... had to come down and there was nothing he could do." Brooks testified that, between June 2 and September 27, 2002, the living room walls—including the wall around the outlet that delivered the shock to Jackson—developed water damage to the point where they looked "soft" and "like silly putty." In early October 2002, about five days after Jackson was injured, there was a severe sewage backup in the apartment that required the family to evacuate pursuant to DCHA orders.

Appellants offered the expert testimony of Roger Boyell, an electrical engineer, who went to the apartment in August 2005 to inspect the outlet and the lamp plug involved in the electric shock. On the basis of his inspection, Boyell concluded that "water had been continually dripping in or standing in or around" the outlet box (which he also referred to as the "receptacle") in question. He determined that the "metal parts" of the receptacle had corroded; that there were ripple-marks within the receptacle, a condition that is "[n]ot at all" normal and indicates the presence of liquid; and that there were cavities, which could "fill up" with water, as well as mold-produced discoloration in the wall that housed the outlet. In contrast, Boyell found "nothing remarkable about the [lamp] plug" (which Brooks had saved even though the lamp itself had been lost after being placed in storage). He therefore concluded that the water in the receptacle, not a defective lamp, caused Jackson's injuries, explaining that when the child attempted to plug in the lamp, "water [that] had been sitting in the receptacle ... or behind the receptacle ... short circuited, shocked her, boiled out, spurted and burned her."

DCHA's electrical-engineering expert, Christoph Flaherty, was in the apartment on October 11, 2005, and November 9, 2005, and also inspected the wall, outlet, and plug. In addition to his other testimony, which we discuss *infra*, Flaherty testified that any water damage to the wall and outlet had resulted from vandals taking apart and stealing plumbing fixtures after Brooks and her family had vacated the apartment (vandalism that commenced well after the September 27, 2002 incident, but before Boyell conducted his inspection). Although Flaherty stated on direct examination that he could not opine as to whether the lamp cord or plug caused or contributed to the shock, he testified on cross-examination that the plug exhibited burn marks, which were "evidence of an electrical short circuit having taken place in the plug itself."

## II.

### A.

■ Appellants first complain that the trial judge refused to strike Flaherty's "surprise testimony" about the condition of the lamp plug—testimony suggesting that the plug might have caused or contributed to the shock—even though DCHA had not indicated in its Rule 26(b)(4) statement or in the parties' joint pretrial statement that Flaherty would testify about the plug. However, a party need not "describe, in a Rule 26(b)(4) statement, every possible di-

rection his expert's testimony could take." *Weiner v. Kneller*, 557 A.2d 1306, 1310 (D.C.1989). We "have generally allowed experts to state the natural concomitants of their arguments, including rebuttals of contrary expert testimony, when [we] have been satisfied that such testimony was of a piece with the original theory" stated in the 26(b)(4) statement. *Id.* Flaherty's testimony about the damage to the plug rebutted Boyell's contrary assertions that the lamp plug was unremarkable and without marks or scars, and was "of a piece" with his testimony that the cause of Jackson's electrical shock was something other than water in the outlet.

More important, it was appellants' counsel who asked Flaherty about the plug (and did so repeatedly despite a defense objection that the questioning was beyond the scope of the direct examination), thereby eliciting the testimony about which appellants now complain.[2] Thus, appellants' own questioning invited Flaherty's response. *Cf. Structural Pres. Sys., Inc. v. Petty*, 927 A.2d 1069, 1080 (D.C.2007) (per curiam) (even if appellee's witness should not "have testified as to her interpretation of the MRI," appellant "invited the error" by cross-examining her on "how the MRI . . . influenced her opinion," and thus could not be allowed to profit from the error on appeal). We discern no basis for disagreeing with the trial court's assessment that there was no evidence of "some strategic decision by the defense, to try to ambush" plaintiffs. We also agree with the trial court that, since appellants' own expert examined the plug and "unequivocally" concluded there was no problem with it, and since appellants also had the opportu-

nity to present rebuttal testimony, they could show no undue prejudice from Flaherty's testimony about the plug.

## B.

Appellants' next argument is that Flaherty, whom the court accepted as an expert in electrical engineering, was not qualified to opine on whether the walls in the apartment could hold water. Before the defense case began, appellants' counsel alerted the court to a "preliminary matter" relating to DCHA's representation in the joint pretrial statement that its "electronic expert is going to offer expert evidence about the walls, and construction, and whether a wall can retain . . ." The trial judge interrupted, saying "we'll take this up at a break," explaining that she did not want to keep the jury waiting and that the defense expert was not due to testify until later in the trial. During the subsequent break, appellants' counsel did not revisit the objection she had started to make, and she also made no such objection later, including when Flaherty testified that the walls "could not have had water up to the level of the outlet" and that "it was impossible for there to have been standing water inside the wall and outlet at the time of the accident." Only after both parties had rested did appellants' counsel move to strike Flaherty's testimony on the ground that his "testimony regarding the walls of the dwelling . . . exceeds his expertise" as an electrical engineer. The court responded that "this is too late to be raising those objections" and explained that it would be unfair to strike the witness's testimony because "the defense didn't get an oppor-

---

**2.** Appellants' counsel variously asked Flaherty whether he "f[ound] anything in the plug that, in [his] opinion, caused this event"; whether he had ascertained that the "plug had anything to do with the electrical event complained of"; whether the plug showed "that it was burnt, that there was burning in the plug"; and whether the appearance of the plug was "consistent with an electric shock arching through[,] burning the child's hand, and also burning the plug that the child was holding[.]"

tunity to rephrase questions" or otherwise respond.

■ We reject appellants' challenge to the court's ruling for two reasons. First, because appellants failed to object at the "appropriate time" during the trial proceedings, we review only for plain error, and we find none.[3] The court's refusal to strike Flaherty's testimony regarding water in the walls was not "obvious" error and we also discern no miscarriage of justice (since, *inter alia*, it is not clear from the record that Flaherty lacked the requisite qualifications). Even more fundamental, Flaherty's testimony was premised *not* on the capacity of wall material to hold water, but on the visual inspection he conducted upon tearing out a portion of the apartment wall. Specifically, Flaherty testified that, because the outlet receptacle had several holes in it (a result of the standard installation process), it could not have been full of water on September 27, 2002, unless the surrounding wall had "been full of water up to [the] level of the outlet box itself...." He went on to explain that the water in the wall could not have reached that level because there were no penetrations within the wall to indicate that pipes supplying water had ever run through it. Thus, he concluded that the walls could not have been holding back water because there was no "potential source of water inside the wall...." He also explained that he saw no evidence of moisture in the upper part of the wall that would have suggested a leak from somewhere above the wall. Appellants have not shown why any expertise "in home construction or the ability of dry wall to hold water" was necessary to support the foregoing observations or the conclusions Flaherty drew from them.

### C.

We turn next to appellants' argument that the trial court erroneously restricted the jury's consideration of their breach-of-contract claim. In the joint pretrial statement, appellants specified that their theory of contractual breach was that "DCHA ... failed and refused to repair the Heating system's leaking water pump and gasket, and the water logged walls ... [and thereby] breached the lease Agreement with Plaintiff, Kendra Brooks, which breach resulted in bodily injuries to Sullivan Jackson." In addition, during trial, appellants' counsel agreed with the trial judge's statement that appellants were seeking "damages for [Jackson's] personal injury" (including damages relating to "the child's mental health ... occasioned by" the family's being forced to move), and not "some other kind of damages based on the contract and housing issues .... [such as] some failure to provide ... payments of rent or effective alternative housing."

■ During trial however, appellants' counsel attempted to present evidence regarding matters other than Jackson's injuries (for example, to elicit testimony that Brooks was required to continued to pay rent on the apartment even after she was forced to move and to show a video showing portions of the apartment not related to the September 27 incident). The court precluded such evidence as irrelevant to appellants' claimed damages. In light of appellants' representations in the joint pre-trial statement and in open court, we discern no error in the court's rulings. *Cf. Robinson v. Howard Univ.*, 455 A.2d 1363,

---

**3.** *In re A.R.*, 679 A.2d 470, 477–78 (D.C.1996) (where party raised challenge to questioning of witnesses only after all testimony had been presented, plain-error review was appropriate, meaning that party could not be entitled to relief unless error was obvious and not correcting it would result in a miscarriage of justice).

1368 (D.C.1983) ("[T]he trial court could, and possibly should, have insisted that appellant proceed to trial with her evidence as limited by the pretrial statements and the pretrial order[.]"). Even if, as appellants argue, the excluded evidence was "proof of the magnitude of the negligence in management of the property" and of "a pattern of neglect," that did not make it relevant to the specific claims that were before the jury.

Appellants also argue that the court erred in declining to use their proposed verdict form, which asked, "Do you find that Defendant, DCHA, breached its contractual lease agreement with Plaintiff, Kendra Brooks?" (and, if the jury answered yes to that question) "How much money do you award Plaintiffs as compensation for the Breach of Contract?" The verdict form that the court sent to the jury asked jurors to determine, with respect to appellants' contract claim, whether DCHA "breached its contractual lease agreement"; and, if so, whether "that breach resulted in an electrical shock and injuries to Sullivan Jackson and related medical expenses to Kendra Brooks" and (if yes) "[H]ow much money do you award ... Jackson, for her injuries and damages ... [and] Brooks for medical expenses for injuries to ... Jackson?" Appellants complain that the verdict form that was used "gutted" their breach-of-contract claim.[4] The controlling rule, however, is that a trial judge has discretion to decide the "form and substance" of verdict-form interrogatories so long as they cover all "material factual issues." *District of Columbia v. Banks,* 646 A.2d 972, 982 (D.C.1994) (quoting *Scott v. Isbrandtsen Co.,* 327 F.2d 113,

119 (4th Cir.1964)). We are satisfied that the verdict form that was used "present[ed] ... fairly" appellants' theory of contract liability as appellants had confirmed it to the court at trial and in the pre-trial statement. *Id.*

■ We likewise reject appellants' argument that the court erred in its response to the jury's questions about the scope of the contract claim. During deliberations, the jury sent a note asking, "Are we to rule on negligence *and* breach of contract leading to the shock only or Are we to rule also on general breach of contract and negligence?" The court sent the jury a reply stating, "[Y]our job is to determine the facts relating in any way to negligence and breach of contract in connection with the electric shock, not in connection with general breach of contract...." Here, too, the court's response reflected appellants' theory of liability, reiterated by appellant's counsel during the bench conference on the jury note, that appellants were "not asking for any damages connected to the breach of contract other than the damages connected to the personal injury to Sullivan Jackson...." Moreover, the "relating in any way to" language of the court's response to the jury permitted jurors to consider injuries resulting directly from the shock (e.g. Jackson's burns) and indirectly from the shock (e.g. appellants' allegations about Jackson's resultant emotional trauma, as exacerbated by the family's relocation).[5]

### D.

■ Appellants assert after the September 2002 incident and after appellants filed

---

4. In the trial court, by contrast, appellant's counsel stated only that "my objection is that I would rather that the [verdict form] I submitted be used."

5. We need not reach the issue, raised by DCHA below, whether damages for Jackson's claimed mental distress would have been recoverable for the (claimed) breach of contract.

their complaint (on January 28, 2005), DCHA "permitted pipes to be broken," and "permitted water to flow unimpeded from outside ... across the floor of the dwelling[,]" thereby (appellants argue) destroying or concealing evidence of its negligence.[6] Accordingly, appellants contend, the trial court erred in denying their request for a spoliation instruction, i.e., an instruction that the jury could "draw an adverse inference" from DCHA's failure "to preserve the evidence under its exclusive control and custody[.]" [7]

■ This court has instructed that where a trial court finds that a party lost or destroyed potential evidence within its exclusive control with "gross indifference to or reckless disregard for the relevance of the evidence to a possible claim," the court "must submit the issue of lost evidence to the trier of fact with corresponding instructions allowing an adverse inference." *Williams v. Wash. Hosp. Ctr.*, 601 A.2d 28, 31 (D.C.1991) (quoting *Battocchi v. Wash. Hosp. Ctr.*, 581 A.2d 759, 767 (D.C.1990)). However, "[w]here the negligence is not intentional or reckless, the court is accorded discretion in determining whether to give an adverse inference instruction and we will not disturb its decision absent an abuse of that discretion." *Williams*, 601 A.2d at 31. In determining whether the failure to give an instruction was error, we look to the degree of preju-

dice, if any, to a party's ability to mount its case. *Id.* at 34.

Here, we can find no clear error and no abuse of discretion. Appellants argued in a motion to the trial court that DCHA destroyed the pipes in "bad faith," but they cited no support for this contention.[8] Further, having reviewed the record, we cannot say that the evidence compelled the trial court to find that DCHA's conduct in not preventing the vandalism was reckless or intentional. Moreover, even though the court did not give a spoliation instruction, appellants were permitted to argue to the jury that they should ask themselves why DCHA, which was "in charge of [the] evidence," had "let that evidence ... get marred" when it knew that the experts were going to conduct their inspections. In addition, appellants showed the jury a videotape made by Brooks of the apartment walls in September 2003, a time when, according to appellants, the walls looked the same as they looked on September 27, 2002. Also, at the time they performed their inspections, the parties' experts were aware of the vandalism, and thus both had the opportunity to consider whether the water damage observed during the inspections was more likely the result of water-logging that had occurred by September 27, 2002, than of the vandalism.[9] In light of all these factors, and

6. Specifically, appellants argue that, by allowing the destruction of pipes and the dripping of water into the apartment prior to Boyell's August 2005 inspection, DCHA "virtually destroyed the credibility" of Boyell's testimony "that there was considerable evidence of rust, corrosion in the electrical outlet ... that existed at the time of the injury[,]" because "the jury was led to believe ... that evidence of water in the electrical outlet" simply resulted from later vandalism of the property.

7. Without further explanation, the court ruled that a spoliation instruction was not warranted "under the facts of this case."

8. Brooks testified that DCHA workmen did nothing to stop water from coming into the apartment when they were in the area on the date of Boyell's inspection visit, but appellants provided no evidence that the workers were aware of water running into the apartment prior to that visit.

9. Appellants' expert Boyell testified that he "didn't think [the] vandalism was relevant" and that the water running across the floor of the apartment at the time of the inspection was "just enough to get your feet wet," i.e., not at outlet level.

given the evenhandedness of the court's rulings,[10] we cannot conclude that the trial court abused its discretion in denying the requested instruction.[11]

## III.

Appellants are not entitled to a new trial on the basis of the alleged errors discussed above, but a new trial possibly is warranted on the basis of their remaining claim—their claim that they are entitled to an opportunity to present their case with the aid of documents that DCHA produced for the first time while this appeal was pending, after the Superior Court ruled that the documents could not be withheld under a claim of privilege. The background is as follows.

During discovery in this case, DCHA denied that it had incident reports referring to the September 27, 2002 incident, and it refused to produce some documents relating to water damage in the apartment. However, appellants surmised that reports were created, soon after Jackson was injured, by DCHA employees, including Denise Butler, a DCHA housing manager, and Steven Firth, DCHA's Director of Facilities for the Anacostia Region, who inspected the apartment after the October 2002 sewage back-up. After the jury verdict in favor of appellees and within ten days after the trial court entered judgment, appellants filed a motion for a new trial pursuant to Super. Ct. Civ. R. 59(a)(1), arguing, among other things, that DCHA had "secreted and/or destroyed relevant documentary evidence" and "misrepresented to the court .... during discovery that the documents did not exist." The court denied the motion, finding that appellants had not offered convincing evidence that the documents in question existed or had been improperly withheld by DCHA.

Thereafter, during the pendency of this appeal, appellants filed a FOIA request, seeking copies of the reports they believed DCHA had withheld. See D.C.Code §§ 2–531—2–540 (2006 & Supp.2009). When DCHA denied the FOIA request, appellants petitioned for review by the Mayor's Office.[12] The Mayor's FOIA Officer ordered DCHA to produce "information responsive to [appellants'] request," but DCHA refused to comply, claiming that the responsive documents (the "Butler report" and the "Firth report") were privileged as "work product." In response, appellants filed a declaratory-judgment ac-

10. The court refused appellants' request for a spoliation instruction based on the vandalism to the apartment, and, earlier, likewise refused to give such an instruction in favor of DCHA (based on Brooks's loss of the lamp, which she explained had been sent to storage when appellants moved from the apartment and which apparently was lost as a result of a delinquency in paying storage fees).

11. We agree with DCHA that appellants have waived other claimed instructional errors to which they allude in their brief (e.g., regarding the court's refusal to give a *res ipsa loquitor* instruction and its refusal to instruct the jury "regarding duty towards children") because they have not "spell[ed] out [these] arguments squarely and distinctly" *Wagner v.*

*Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 554 n. 9 (D.C.2001) (citation omitted), and with citations to authority. D.C.App. R. 28(a)(8)(A) (Appellant's "brief must contain .... the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]"). "It is not enough merely to mention [an] argument in the most skeletal way[.]" *Wagner,* 768 A.2d at 554 n. 9.

12. *See* D.C.Code § 2–537(a) (2006 Repl.) (For the most part, "any person denied the right to inspect a public record of a public body may petition the Mayor to review the public record to determine whether it may be withheld from public inspection.").

tion in Superior Court.[13]  On June 23, 2009, the Superior Court (the Honorable Brian Holeman) dismissed the FOIA complaint, concluding that the court lacked jurisdiction to compel production of the documents because they were the subject of the instant pending appeal.

After that ruling, and after this Court had heard (the first) oral argument in this appeal, DCHA asked us to remand the case to the Superior Court "for an *in camera* inspection [of the Butler and Firth reports] and to determine whether the documents were privileged." We granted the motion.  On December 23, 2009, the trial court issued supplemental findings, concluding "that with the exception of two sentences in" the Butler report, "the documents are not privileged" because DCHA "failed to demonstrate that any other portions of the documents were prepared in anticipation of litigation."  Adhering to the narrow scope of this court's remand order, the trial court did not reach the issue of whether the documents were newly discovered evidence that would justify a new trial.

After the trial court's ruling on the privilege issue, we received supplemental briefs from the parties and again heard oral argument.  Having gained access to the Firth report and the redacted Butler report, appellants contend that the reports "would have unequivocally corroborated" Brooks's testimony and "are of such magnitude that had they not been secreted during discovery ... a different result would have been reached by the jury[.]" In its supplemental brief, DCHA does not dispute the trial court's determination that the Firth report and the vast majority of

the Butler report are not privileged.  Instead, DCHA argues that the documents are not "newly discovered evidence warranting a new trial" because the information contained in them is cumulative of evidence presented at trial, would not have changed the outcome of trial, and, in any event, was information that appellants "could have discovered ... with the exercise of minimal diligence."

We reject DCHA's lack-of-diligence argument.  During discovery, appellants requested "all [d]ocuments of any sort, ... connected to any investigation by DCHA staff of the events in question, and] all incident reports issued in connection to any of the events complained of in the Complaint."  DCHA did not make a claim of privilege, but responded that it was "not aware of any documents."  Additionally, appellants' interrogatories asked DCHA to "[i]dentify those persons in your employ, and give the substance of any and all ... incident reports [or] memos ... made by them concerning the events in question" and to "state the substance of [any] report ... made by your or by an employee or agent ... in the ordinary course of business with respect to the occurrences...."  The instructions to appellants' interrogatories specified that the interrogatories referred to occurrences "mentioned or complained of in the pleadings," and thus referred to the October 2002 flood as well as the September 27, 2002 incident and the June 2002 flood, all of which were mentioned or complained of in appellants' Complaint.  Again, DCHA did not make a claim of privilege, but answered that "no reports, memos, recorded statements, etc. exists." [14]  Oppos-

---

13.  *See* D.C.Code § 2–537(a)(2) ("If the public body continues to withhold the record" after "the Mayor decides that the public record may not be withheld," "the person seeking disclosure may bring suit in the Superior

Court ... to enjoin the public body from withholding the record and to compel the production of the requested record.").

14.  And, in opposing appellants' motion to compel, DCHA told the trial court "there is

ing appellants' (unsuccessful) motion to compel discovery responses, DCHA stated that it would not provide information or documents pertaining to the flooding that occurred in October 2002 (even though that flood turned out to be the focus of DCHA's questions when it called Firth to testify at trial). Responding to appellants' assertion in open court that DCHA had not produced documents that appellants believed existed, the court explained, "I can't order them to produce things they say they don't have."

As has become apparent, and despite DCHA denials and refusals, DCHA had in its possession the Butler report, two sentences of which, as the trial court described, "contain[ ] a reference to notice of a potential claim in connection with the electrical shock."[15] Supplemental Findings at 9. DCHA also had the Firth report, which related to conditions in the apartment that Firth observed when he inspected it after the October 2002 sewage back-up. DCHA had an affirmative obligation to investigate whether such reports existed,[16] and appellants were entitled to rely on DCHA's discovery responses. DCHA cannot fairly be permitted to escape the possible consequences of its breach of that obligation on the basis of its speculation about appellants' ability to have obtained the document contents through some other route.

We also are not persuaded by DCHA's argument that all of the information contained in the newly disclosed documents is merely cumulative of other evidence in the case. For example, the Firth report, prepared on November 4, 2002, on the basis of Firth's inspection of appellants' apartment on October 2, 2002, describes "[e]xtensive mold and mildew inside and outside the living room, mechanical room and kitchen walls" and states that "[e]lectrical outlets/switches need to be repaired/replaced where water has penetrated and caused electrical shorts in circuit." The Butler report, similarly, contains an October 2, 2002 notation about Firth's inspection of the apartment unit and "Water in walls." By contrast, at trial, Firth testified that he did not "know how the wall [presumably, the living room wall where the outlet in question was located] would be full of water" when "there's no water pipes" in that wall. Describing what he observed after the October 2002 sewage back-up, Firth testified that the walls "acted like a wick, drawing the water up from the bottom . . . drew the water up, stained." The implication of Firth's trial testimony, it seems to us, was that the effect of water in the apartment was surface stains to the walls rather than water in the walls (as the Butler report mentions) or (as the Firth report describes) water penetration that caused electrical shorts.[17]

no conversation, communication, etc. that would have been transmitted contemporaneous with the September 27, 2002 'event in question,' " even though appellants' interrogatory was not limited to "contemporaneous" communications.

15. Appellants have asked us to rule on whether the trial court correctly ruled that these two sentences of the Butler report were privileged. We decline to do so, concluding that even if the sentences were not covered by the work product privilege, they are cumulative of other evidence and thus are not material,

and that any error in the court's ruling therefore is harmless.

16. Cf. Anderson v. Cryovac, Inc., 862 F.2d 910, 929 (1st Cir.1988) ("Once a proper discovery request has been seasonably propounded, we will not allow a party sentiently to avoid its obligations by . . . failing to examine records within its control.").

17. DCHA argues that appellants could have asked Firth about damage to electrical switches or outlets. But, without the newly discovered reports, it appears that appel-

Further, defense expert Flaherty similarly testified that the corrosion and damage to the receptacle in question were due to "increased moisture levels in the apartment" following (post–2003) vandalism in the apartment, not to standing water at the time Jackson was injured near the end of September 2002. Flaherty also opined that there was evidence of an "electrical short circuit [within the lamp] plug" and testified that there must have been "some pre-existing damage to the plug's insulation in order for this type of damage to occur to the plug." The Butler and Firth reports, by contrast, provide evidence from a DCHA employee about water in walls, water damage to the living room walls, and water having penetrated electrical outlets and caused electrical shorts by October 2, 2002—evidence that did not necessarily describe the conditions on September 27, 2002, but that nonetheless seems significant since it pre-dated the vandalism to which the defense expert attributed any water damage to the receptacle.

DCHA's remaining point is that the newly disclosed documents would not have changed the outcome of the trial. In advancing that argument, DCHA invokes the standard that applies in a determination of whether a party is entitled to relief from judgment on the basis of newly discovered evidence under Super. Ct. Civ. R. 60(b)(2). *See, e.g., Merrell Dow Pharmaceuticals v. Oxendine*, 649 A.2d 825, 831–32 (D.C.1994) ("[C]ourts have generally held that part of the criteria for the grant of a motion on the basis of newly-discovered evidence is that the evidence is material and control-

ling and clearly would have produced a different result if presented before the original judgment[.]") (citing, *e.g., Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir.1990) (per curiam) (other citations and internal quotation marks omitted)). However, in our view, the posture and facts of this case may make appropriate the application of different standard. DCHA sought the record remand as an aid to resolution of the pending appeal. Thus, with the documents that were made available to appellants as a result of the record remand now also before us, the issue before us remains whether appellants were entitled to success on their Rule 59 motion for a new trial.[18] Our specific focus, now that we have disposed of the other grounds appellants cited as bases for their Rule 59 motion, is appellants' claim, asserted in their motion, that DCHA withheld evidence and made misrepresentations to the court about the existence of documents—in other words, appellants' allegations about discovery misconduct. Although appellants were unable to document and prove their allegations within the ten days after judgment specified in Rule 59(b), it appears that their inability to do so must be laid in large part (if not entirely) at DCHA's feet. In these circumstances, it may be inappropriate to require appellants to meet the test that applies under Rule 60(b)(2) (a stringent test designed to give effect to the "importance of finality," *Merrell Dow*, 649 A.2d at 831), as if they were seeking relief from judgment in an independent proceeding initiated long after judgment. A more appropriate approach

---

lants would have had no way of testing his response (or, possibly, refreshing his recollection) and risked being stuck with an incomplete or incorrect answer. We note that appellants alleged in their motion for a new trial (but provided no sworn statements or other evidence) that DCHA employees were asked to lie about the occurrences described

in the Complaint and feared losing their jobs if they did not do so.

18. *See* Appellee's Supplemental Memorandum at 1 (describing the issue as "what effect [the documents] would likely have had ... on Ms. Brooks' motion for a new trial").

in the circumstances presented may be the one taken by the United States Court of Appeals for the Ninth Circuit in *Jones.*

In *Jones,* unsuccessful plaintiff Jones moved for a new trial under Fed.R.Civ.P. 59 after obtaining correspondence that defendant had failed to produce during discovery. The district court denied the motion. The Ninth Circuit agreed with the district court that Jones had failed to establish that the newly revealed correspondence constituted a "smoking gun" that likely would have produced a different outcome, as was required for relief on the basis of newly discovered evidence under Rule 60(b)(2). 921 F.2d at 878 (noting that, generally, the "same standard applies to motions on the ground of newly discovered evidence whether they are made under Rule 59 or Rule 60(b)(2)"). The Ninth Circuit went on to reason, however, that "[t]he test to be applied when discovery misconduct is alleged in a Rule 59 motion must be borrowed from cases interpreting Rule 60(b)(3)[.]" *Id.; see also id.* at 878 n. 3 ("Although we have found no case discussing the applicable standard where discovery misconduct is alleged in a Rule 59 motion, the analogy seems inevitable: if, when misconduct was alleged, a stricter standard were applied to a motion under Rule 59 than to one under Rule 60(b)(3), a plaintiff filing within the 10 day period might be unable to obtain a new trial but could thereafter be relieved from the judgment under Rule 60, and thus allowed to begin the litigation all over again."). "Under Rule 60(b)(3), the movant must, (1) prove by clear and convincing evidence that the verdict was obtained through ... misrepresentation, or other misconduct," such as "[f]ailure to disclose or produce materials requested in discovery," and "(2)

establish that the conduct complained of prevented the losing party from fully and fairly presenting his case.... [W]hen the case involves the withholding of information called for by discovery, the party need not establish that the result in the case would be altered." *Id.* at 878–79 (citation and internal quotation marks omitted).[19] Applying those criteria, the Ninth Circuit concluded that "[i]f Jones is able to demonstrate misconduct, the district court must make a fresh determination whether Jones has demonstrated substantial interference by showing the material's likely worth as trial evidence or by elucidating its value as a tool for obtaining meaningful discovery." *Jones,* 921 F.2d at 879 (citations and internal quotation marks omitted). The court reasoned that "evidence that was merely cumulative under the 'different outcome' test, may have substantially interfered with Jones' ability to fully and fairly present her case" and that "Jones may be able to benefit from a presumption of substantial interference if she can demonstrate the misconduct was sufficiently knowing, deliberate or intentional." *Id.* (citations omitted). Because the district court had not considered the alleged misconduct in deciding Jones's Rule 59 motion, the Ninth Circuit remanded the case to the district court "for appropriate proceedings to determine whether Jones can meet her burdens under the Rule 60(b)(3) standard as applied to this Rule 59 motion." *Id.*

We find the Ninth Circuit's reasoning persuasive, and we therefore have determined to proceed as follows. We remand the case for the trial court to determine whether the newly disclosed documents would likely have resulted in a

---

19. *See also Anderson,* 862 F.2d at 924 n. 10 ("When wrongful secretion of discovery material makes it inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to" show a probable change in outcome.).

different outcome to the trial.[20] If the court answers that question in the affirmative, it shall grant appellants a new trial. If the court is unable to conclude that the newly disclosed documents would likely have produced a different outcome, it shall go on to consider whether DCHA engaged in misrepresentation or misconduct in withholding the Firth report and/or the (non-privileged portion of the) Butler report. If the court finds that DCHA's conduct in failing or refusing to produce the reports did not amount to discovery misconduct, the court shall deny the motion for a new trial. If the trial court determines that DCHA's conduct did amount to discovery misconduct, the court shall next consider whether DCHA's conduct prevented appellants from fully and fairly presenting their case (such as by "clos[ing] off a potentially fruitful avenue of direct or cross examination[,]" *Anderson*, 862 F.2d at 925) (a less stringent standard than the "different outcome" test).[21] If the trial court finds in the affirmative, it must grant appellants' motion for a new trial.

*So ordered.*

FARRELL, Senior Judge, concurring:

I join Judge Thompson's excellent opinion for the court, and in particular I agree that where a Rule 59 movant alleges a discovery violation that materially impaired presentation of her case, it makes sense to look to the proof standards of Rule 60(b)(3) instead of requiring her to meet the ultimate test—*i.e.*, clear likelihood of a different outcome—for prevailing on a claim of newly discovered evidence. *But see Columbia Commc'ns Corp. v. EchoStar Satellite Corp.*, 2 Fed.Appx. 360 (4th Cir.2001) (rejecting as without textual support a borrowing of Rule 60(b)(3)'s standards for analyzing discovery misconduct claims under Rule 59).

I write only to point out that the devil may be in the details of deciding what discovery "misconduct," Rule 60(b)(3), justifies relieving a movant of this normal, and critical, proof requirement for a claim of newly discovered evidence. Is even an accidental, inadvertent (but avoidable) failure to produce a document in discovery "misconduct" under the rule? Similarly, is a good faith but mistaken belief that a privilege justifies withholding the document "misconduct"? Or rather, because "misconduct" is textually paired with "fraud" and "misrepresentation" by Rule 60(b)(3), is a greater showing of fault than inadvertent nondisclosure required (considering that a word is generally known by the company it keeps) before Rule 60(b)(3) may be invoked?[1] And, if not—if, as some

---

**20.** The trial judge, rather than this court, must make this determination in the first instance, since she "saw and heard the witnesses and has the feel of the case, which no appellate transcript can impart[,]" *Scott v. Crestar Fin. Corp.*, 928 A.2d 680, 689 (D.C. 2007) (citation omitted), and for that reason is better positioned to assess the probability that the outcome would have been different.

In determining whether a new trial is warranted, "the trial judge need not view the evidence in the light most favorable to the non-moving party. Indeed, the judge can, in effect, be the 'thirteenth juror,' [i.e., she] may weigh evidence, disbelieve witnesses, and grant a new trial even when there is substan-

tial evidence to sustain the verdict." *Fisher v. Best*, 661 A.2d 1095, 1098 (D.C.1995) (citation and internal quotation marks omitted).

**21.** Appellants will have the burden of showing substantial interference with their case presentation by a preponderance of the evidence, *id.* at 926, but "uncertainties attending the application of hindsight in this area should redound to [appellants'] benefit." *Id.* at 924 (citation omitted).

**1.** In *Summers v. Howard Univ.*, 374 F.3d 1188 (D.C.Cir.2004), after noting that "several circuits have held [that] failure to disclose or produce materials requested in discovery can

federal courts have held, even accidental ("innocent") discovery misconduct may justify relief under Rule 60(b)(3)—whence comes the standard all these courts have applied of requiring proof by clear and convincing evidence of the misconduct? (We know, of course, that "fraud" generally requires proof by that standard, but inadvertent "misconduct" does not approximate fraud.)[2] *See generally* 12 MOORE'S FEDERAL PRACTICE § 60.43[4][b] at 60–148 (3d ed. 2010) (noting the "elaborate set of rules for the burden of proof on a Rule 60(b)(3) motion based on misconduct" created by the court in *Anderson, supra* note 2, in turn linked to the court's holding that "even accidental [discovery] omissions" are "misconduct").[3]

I quite understand why the court does not take up these questions now, but they may well need to occupy the trial court on remand and this court down the road.

constitute 'misconduct' within the purview of Rule 60(b)(3)," the Circuit Court pointed out that the plaintiffs' failure to supplement their responses to an interrogatory by notifying the defense of the filing of related litigation ("*Summers II*") took the form of "engag[ing] in repeated, affirmative efforts to keep the filing of *Summers II* a secret from Howard," *id.* at 1193—actions the court had no difficulty characterizing as "misconduct."

2. And likewise, whence comes the rule, *see Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924–26 (1st Cir.1988), that prejudice is "presumed" when the misconduct has been intentional, but not otherwise?

